*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BAPTIST PHYSICIAN HOSPITAL ORGANIZATION, INC.
and BAPTIST HOSPITAL OF EAST TENNESSEE, INC.,
*Plaintiffs-Appellees,*

No. 06-5364

*v.*

HUMANA MILITARY HEALTHCARE SERVICES, INC.,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00588—Thomas W. Phillips, District Judge.

Argued: January 31, 2007

Decided and Filed: March 21, 2007

Before: NORRIS, COLE, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael J. Kitchen, J. BRUCE MILLER LAW GROUP, Louisville, Kentucky, for Appellant. Reuben N. Pelot IV, EGERTON, McAFEE, ARMISTEAD & DAVIS, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Michael J. Kitchen, J. Bruce Miller, J. BRUCE MILLER LAW GROUP, Louisville, Kentucky, for Appellant. Reuben N. Pelot IV, Cheryl G. Rice, EGERTON, McAFEE, ARMISTEAD & DAVIS, Knoxville, Tennessee, for Appellees.

---

## OPINION

---

CLAY, Circuit Judge. In this appeal, Defendant, Humana Military Healthcare Services, Inc., appeals the district court's order finding Defendant liable to Plaintiffs, Baptist Physician Hospital Organization, Inc. and Baptist Hospital of East Tennessee, Inc., for breach of contract and awarding Plaintiffs $1,277,872.90 in compensatory damages, as well as $731,488.65 in prejudgment interest. Plaintiffs properly invoke diversity of citizenship as the basis for federal jurisdiction in this case. *See* 28 U.S.C. § 1332. For the reasons that follow, we **AFFIRM** the district court's order.

1

## BACKGROUND

This Tennessee breach of contract suit was previously before this Court. *See Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894 (6th Cir. 2004) (hereinafter "*Baptist Physician I*"). That appeal arose when the district court granted summary judgment to Defendant on Plaintiffs' breach of contract claim, and separately dismissed Plaintiffs' remaining claims as untimely. On appeal, this Court reversed and remanded.

*Baptist Physician I* aptly set forth background relevant to the initial contract between the parties:

> Pursuant to authority delegated to it by Congress, the Department of Defense established the Civilian Health and Medical Program of the Uniformed Services, called CHAMPUS, in 1967. CHAMPUS beneficiaries include retired armed forces personnel and dependents of both active and retired military personnel. In 1995, the Department of Defense established TRICARE, a managed health care program operating as a supplement to CHAMPUS and involving the competitive selection of private contractors to financially underwrite the delivery of health care services under CHAMPUS. The overall goal of the TRICARE program is to improve the quality, cost, and accessibility of healthcare to the nation's military through the mechanism of a managed care program, and one aspect of the new TRICARE program was the establishment of "Civilian Preferred Provider Networks." *See* 32 C.F.R. § 199.17(p). TRICARE Management Activity, which was previously known as Office of CHAMPUS, is the government office charged with the responsibility of administering TRICARE/CHAMPUS.

> In January 1996, Humana Military Healthcare Services, Inc. was awarded the TRICARE contract for Regions 3 and 4, which covers seven states and includes the State of Tennessee. Under the contract, Humana became the managed care support contractor charged with the responsibility of establishing and managing a Civilian Preferred Provider Network throughout the seven state area. Humana established the preferred provider network by entering into contractual arrangements with individual CHAMPUS participating providers of medical services, one of which was Baptist. Broadly speaking, TRICARE preferred network providers agreed to accept from a managed care support contractor lower reimbursement rates than those authorized under the CHAMPUS reimbursement system, with the understanding that in exchange they would see an increase in directed volume. These discounted rates might be expressed as discounts from the maximum allowable rate under the CHAMPUS diagnostic grouping system (DRG),[1] or as a fixed per diem rate, or as some other agreed-upon rate of reimbursement.

> In the early spring of 1996, Baptist Physician Hospital Organization, Inc. and Baptist Hospital of East Tennessee, or more simply "Baptist," entered into negotiations with Humana to become a TRICARE preferred network provider.

*Baptist Physician I*, 368 F.3d at 895-97.

---

[1] Diagnostic related groups (DRGs) are "a method of dividing hospital patients into clinically coherent groups based on the consumption of resources." 32 C.F.R. § 199.2. "Patients are assigned to the groups based on their principle [sic] diagnosis (the reason for admission, determined after study), secondary diagnoses, procedures performed, and the patient's age, sex, and discharge status." *Id.*

At trial, the parties presented a more detailed picture of their relationship preceding, during, and subsequent to executing the Letter of Agreement (hereinafter "Agreement"), by which Plaintiffs contracted to provide care to TRICARE beneficiaries in Defendant's network.[2] On August 6, 1996, Defendant's Director of Network Development, Richard Mancini ("Mancini"), signed the Agreement on Defendant's behalf. Therein, Defendant contracted to reimburse Plaintiffs according to the terms of a "Hospital Payment Arrangement." As the court in *Baptist Physician I* explained, the parties adopted

> a three-tiered system of discounted reimbursement from the CHAMPUS rates depending on the number of other TRICARE providers in the area . . . . [T]he "Hospital Payment Arrangement" . . . was expressed as a percentage discount off the CHAMPUS DRG reimbursement rate with a "stop loss" provision (in the italicized language below) consisting of an increased rate of payment for certain high-dollar inpatient claims as an alternative to a percentage discount from standard government rates. The purpose of the stop-loss provision is to reduce the risk of losses to Baptist in large individual cases that Baptist believed the percentage discount off CHAMPUS DRG rates would create. The contractual provision was expressed as follows:

> **Baptist Health System as Exclusive Provider**
>
> Inpatient
> 20% Discount from CHAMPUS DRG rates;
> *Any case with provider charges greater than $30,000 reverting to a 45% discount from provider charges.*
>
> Outpatient
> 30% Discount from CHAMPUS allowables.
>
> **Baptist Health System + 1 Additional Provider**
>
> Inpatient
> 20% Discount from CHAMPUS DRG rates;
> *Any case with provider charges greater than $25,000 reverting to a 35% discount from provider charges.*
>
> Outpatient
> 25% Discount from CHAMPUS allowables.
>
> **Baptist Health System + 2 Additional Providers**
>
> Inpatient
> 15% Discount from CHAMPUS DRG rates;
> *Any case with provider charges greater than $25,000 reverting to a 30% discount from provider charges.*

---

[2]We are largely guided in our narrative by the district judge's findings of fact, which we find – with one insignificant exception – were not clearly erroneous. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 355 F.3d 574, 589 (6th Cir. 2004).

> Outpatient
> 25% Discount from CHAMPUS allowables.
>
> (Emphasis added.) Under each tier, Baptist and Humana agreed to the "stop loss" language which increased reimbursement to Baptist when a particular inpatient hospital stay exceeded a certain dollar amount. In such cases, the reimbursement rate would not be a percentage discount off the CHAMPUS DRG rate, but rather would "revert" to a percentage discount off the provider charges, which are the charges the hospital would otherwise charge for the services rendered.
>
> An example illustrates how the "stop loss" provision would work. Suppose a certain hospital stay resulted in provider charges of $77,098, but the maximum CHAMPUS DRG reimbursement rate for this particular stay is only $27,755.00. Without the stop loss provision, Baptist as the exclusive TRICARE provider under the above agreement would receive $22,204, which represents a 20% discount from the CHAMPUS DRG rate and an effective 71% discount from provider charges. Under the stop loss provision, however, Baptist would receive $42,404, or a 45% discount from the provider charges. In effect, the stop loss provision operates to increase the net overall discount for the business associated with the TRICARE program.
>
> As illustrated above, for certain claims the reimbursement amount calculated as a percentage of provider charges was greater than 100% of the CHAMPUS DRG rate.

*Baptist Physician I*, 368 F.3d at 896-97. At the time he signed the Agreement, Mancini knew Defendant had no intention of paying the stop loss claims pursuant to the Agreement inasmuch as they exceeded CHAMPUS allowable charges.

Two days after he executed the Agreement, in an August 8, 1996 letter to Plaintiffs' representative, Jim Goodloe, Mancini wrote as follows:

> Jim, as we move toward the next round of negotiations, specifically: Inpatient per diem rates, I want to make sure we both understand that your claims will be paid according to a discount from Government allowables. I know there has been some question that you wanted to be paid more than the Government provides, but we aren't allowed to pay your facilities any greater than the non-network rate. Accordingly, the per diem rates that we agree upon will need to be comparable as provided for in paragraph M of our contract.

*Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 415 F. Supp. 2d 835, 848 (E.D. Tenn. 2006) (hereinafter "*Baptist Physician II*"). The district court found that this letter concerned physician reimbursement terms, and not the stop loss provisions.[3]

The Agreement contemplated additional negotiations in September 1996 to establish a system of reimbursement on a per diem basis and, at trial, Mancini testified that he believed that the parties would have dispensed with the stop loss provisions at that time. No subsequent renegotiation occurred, and the stop loss provisions remained in effect throughout the life of the Agreement. Mancini further testified that Defendant did not pursue renegotiation because the process would have clarified that Defendant intended to cap payments at government allowables, and not to pay according to the Agreement.

---

[3]In fact, the district court found that the parties amended the physician payment provisions in September 1996, but that those amendments did not impact hospital reimbursement for stop loss claims.

In August 1996, Plaintiffs lacked the personnel and technology necessary to closely monitor payments from third party payors, including Defendant, to insure payment of submitted claims according to negotiated contract terms. However, over the course of the Agreement with Defendant, Plaintiffs took steps to improve claims tracking. To start, Plaintiffs purchased software (called "PCMS") capable of auditing payments and exposing payment variances. This software required Plaintiffs to load their contracts into the system before it could adequately monitor payment compliance. Plaintiffs also hired a contract analyst, Anahita Hodge ("Hodge"), primarily assigning her to scrutinize payments from third party payors. Ultimately, Plaintiffs loaded their contract with Defendant into the PCMS system in November 1998.

In early 1999, Hodge identified the underpaid stop loss claims and, in February 1999, requested that Defendant reprocess the claims in compliance with the terms of the Agreement. In a July 22, 1999 letter to Defendant's government benefits administrator, Hodge again requested the additional stop loss reimbursement. Subsequently, Hodge spoke to Carmen Montanez ("Montanez"), then one of Defendant's employees, who informed her that Defendant would not pay the full stop loss amount on the contested claims. During the conversation, Montanez cited the TRICARE / CHAMPUS policies and procedures and told Hodge that those policies foreclosed Defendant from paying rates in excess of the CHAMPUS DRG-rates. In the months that followed, Plaintiffs at no point communicated to Defendant an intent to drop the stop loss claims. Ultimately, Defendant sent Plaintiffs a letter on February 5, 2001 notifying Plaintiffs that it was exercising its right to terminate the Agreement, effective May 6, 2001. Defendant terminated the Agreement due to Plaintiffs' continued insistence that they be reimbursed according to the Agreement's stop loss provisions.

Between July 1, 1996 and May 6, 2001 – the life of the Agreement – 85 inpatient claims for medical care rendered at Plaintiffs' facilities exceeded the stop loss threshold. In each instance, Plaintiffs did not receive reimbursement according to the stop loss provisions. Rather, without Plaintiffs' knowledge, Defendant capped reimbursement at 100% of the CHAMPUS DRG-rate. Applying the stop loss provisions of the Agreement, Plaintiffs should have received $2,595,294.94 in payment of those claims. In actuality, Defendant paid only $1,317,422.05, thus yielding an underpayment of $1,277,872.89 on the stop loss claims.[4]

The district court considered several issues at trial on remand, including: (1) whether the parties modified the Agreement so that high-dollar claims would be paid under the CHAMPUS DRG-based payment system as opposed to the stop loss provisions; (2) whether Plaintiffs waived their claims; (3) whether equitable doctrines barred Plaintiffs' claims; and (4) whether Defendant was entitled to recover alleged overpayments on outpatient claims. Ultimately, the district court ruled in favor of Plaintiffs on their breach of contract claim, and against Defendant on its defenses of modification, estoppel, failure to mitigate damages, and laches. The district court further found that Defendant failed to prove damages, a required element of its counterclaim. In an opinion dated February 13, 2006, the district court awarded Plaintiffs $1,277,872.90 on their breach of contract claim, along with prejudgment interest totaling $731,488.65. Defendant timely appealed.

---

[4]The district court additionally found facts relevant to Defendant's counterclaim that it had overpaid Plaintiffs for a number of outpatient claims by misapplying the "tier" system established in the Agreement. On appeal, Defendant waives its challenge to the district court's dismissal of its counterclaim. Accordingly, we need not further explore the circumstances of Defendant's overpayment.

## DISCUSSION

### I.    THE DISTRICT COURT DID NOT ERR IN DEEMING CAPITAL REIMBURSEMENT EVIDENCE IRRELEVANT

As a matter of law, the district court concluded that "[t]he monies paid to [Plaintiffs] pursuant to Capital Reimbursements are totally irrelevant to the Agreement at issue, would have been paid with or without an agreement between the parties, and were not paid pursuant to the Agreement." *Baptist Physician II*, 415 F. Supp. 2d at 853. Defendant vehemently disagrees and, in fact, rests the weight of its appeal on this very question. Because the district court's disposition does not elucidate the rationale underlying its conclusion that capital payment evidence was irrelevant, we review the matter *de novo* as a conclusion of law.[5] *Kalamazoo River Study Group*, 355 F.3d at 589.

The relevance of the proffered capital payment evidence substantially turns on a question of regulatory interpretation. That is, whether capital payments flow only to those preferred network providers subject to the DRG-based payment system, or whether providers which contract for alternative payment methodologies may also receive capital payments consistent with the TRICARE / CHAMPUS regulations. As a corollary, we must also consider the significance of certifications submitted to obtain capital payments, wherein providers document the total number of inpatient days "provided to all patients in units subject to DRG-based payment," as well as the "[t]otal allowed CHAMPUS inpatient days provided in units subject to DRG-based payment." *See* 32 C.F.R. § 199.14(a)(1)(iii)(G)(3)(vi)-(vii).

As with all matters of regulatory interpretation, we look first to the plain and unambiguous meaning of the regulation, if any. *See Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000) (quoting *Bartlik v. U.S. Dep't of Labor*, 62 F.3d 163, 165-66 (6th Cir. 1995)) ("We read statutes and regulations with an eye to their straightforward and commonsense meanings," and where the regulation's language reveals an "unambiguous and plain meaning . . . , our task is at an end"). Defendant fails to identify provisions either in the applicable regulations or the authorizing statutes that plainly sets forth the meaning of the regulations. Nor could it, for the TRICARE / CHAMPUS regulations do not squarely address this question.

We next look to the regulatory scheme, reading the regulation in its entirety to glean its meaning. In so doing, we find that the TRICARE / CHAMPUS regulations do not preclude capital payments to preferred network providers which, by agreement with Managed Care Support ("MCS") Contractors, receive reimbursement for inpatient care under alternative payment methodologies. As detailed in the TRICARE regulations,

> [t]he TRICARE program implements management improvements primarily through managed care support contracts that include special arrangements with civilian sector health care providers . . . . Implementation of these management improvements includes adoption of special rules and procedures not ordinarily followed under CHAMPUS . . . . This section establishes those special rules and procedures.

---

[5]In the alternative, we could construe this as a ruling on the admissibility of the capital payment evidence and, accordingly, could review for abuse of discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Although the district court's review of the evidence presented at trial notably excludes reference to Defendant's proffered capital payment exhibits (Exhibits 54(A)-(K)), it does recount witness testimony on the issue. *See Baptist Physician II*, 415 F. Supp. 2d at 841, 847. Because we cannot say with certainty that the district court intended to rule on the admissibility of the capital payment exhibits, we err on the side of caution and apply the less deferential *de novo* standard of review.

32 C.F.R. § 199.17(a)(1). While managed care contractors may enter into special arrangements with preferred network providers consistent with the "special rules and procedures" set forth in the TRICARE regulations, CHAMPUS regulations remain effective and applicable to TRICARE providers unless the special rules and procedures state otherwise.

As CHAMPUS providers, by default, Plaintiffs were entitled to receive capital payments regardless of their Agreement with Defendant. Federal regulations permit all CHAMPUS providers to receive capital payments to offset the costs of treating CHAMPUS beneficiaries. *See* 32 C.F.R. § 199.14(a)(1)(iii)(G).[6] Under 32 C.F.R. § 199.14, a TRICARE preferred network provider is not rendered ineligible for capital payments merely because they have negotiated an "alternative payment methodology" for reimbursement. Regulations implementing the TRICARE Program provide that where "rules, procedures, rights and obligations" under TRICARE differ from those under CHAMPUS, those set forth in the TRICARE regulations "take precedence and are binding." 32 C.F.R. § 199.17(a)(4). Illustratively, the TRICARE Reimbursement Manual ("the Manual") cites to 32 C.F.R. § 199.14 as authority for its discussion of capital payments. Accordingly, where the TRICARE regulations do not explicitly conflict with the CHAMPUS regulations, those pre-existing regulations apply to TRICARE as well.

Defendant directs our attention to the section of the Manual that discusses adjustments to payment amounts, such as capital payments, and, specifically, to the introductory paragraph on 'Applicability.' There, the Manual states –

> This policy is mandatory for reimbursement of services provided by either network or non-network providers. However, alternative network reimbursement methodologies are permitted when approved by TMA *and specifically included in the network provider agreement*.

TRICARE / CHAMPUS Policy Manual, 6010.53-M, Ch. 6, Section 8 at I (*available at* J.A. at 1050 (emphasis added)) The Agreement at issue does not specifically include language excepting Plaintiffs from the category of providers typically eligible to receive capital payments under the regulations.

In fact, that same section of the Manual details the entitlement to, and procedures for payment of, capital costs. More specifically, it establishes the obligations of both the provider and the MCS contractor. In a subpart with the heading "Negotiated Rates," the Manual states:

> *If a contract* between the MSC prime contractor and a subcontractor or institutional network provider *does not specifically state the negotiated rate includes all costs that would otherwise be eligible for additional payment, such as capital* and DME, *the MCS prime contractor is responsible for reimbursing these costs* to the subcontractors and institutional network providers *if a request for reimbursement is made*.

---

[6]Specifically, the regulations state:

When requested in writing by a hospital, CHAMPUS shall reimburse the hospital its share of actual capital costs reported annually to the CHAMPUS fiscal intermediary. Payment for capital costs shall be made annually based on the ratio of CHAMPUS inpatient days for those beneficiaries subject to the CHAMPUS DRG-based payment system to total inpatient days applied to the hospital's total allowable capital costs. Reductions in payments for capital costs which are required under Medicare shall also be applied to payments for capital costs under CHAMPUS.

32 C.F.R. § 199.14(a)(1)(iii)(G)(1).

*Id.* at III.B.4.d. (*available at* J.A. at 1058-59 (emphasis added))  Defendant, as the MCS contractor for its region, negotiated rates with Plaintiffs, an institutional network provider.[7]  Consistent with the Manual, the Agreement *could have* expressly stipulated that payment at the negotiated rate would incorporate capital payments.  The Agreement did not make Plaintiffs' receipt of reimbursement under the stop loss provisions conditional upon forbearance from receipt of capital payments.[8]  Plaintiffs therefore remained entitled to receive capital payments notwithstanding the operation of the negotiated alternative to the DRG-based rates.

This reading of the regulations is reinforced by the Department of Defense's ("DOD's") intent in implementing the TRICARE program.  In response to its Proposed Rule, DOD received comments suggesting that the Final Rule should more specifically detail special reimbursement methods for network providers under § 199.17(p).  DOD responded:

> The rule provides added flexibility to vary payment provisions from those established by regulation, to accommodate local market conditions.  To attempt to specify in advance the possible reimbursement approaches would defeat our purpose of providing a flexible mechanism.  We also disagree that network rate setting should be the same as under standard CHAMPUS rules; a key aim of managed care programs is to negotiate lower rates of reimbursement with networks of preferred providers.

TRICARE Program; Uniform HMO Benefit; Special Health Care Delivery Programs, 60 Fed. Reg. 52,078-01, at 52,086 (Oct. 5, 1995) (now codified at 32 C.F.R. § 199.17).  Although the parties here did not negotiate lower rates of reimbursement for the stop loss claims, Defendant did have increased flexibility in negotiations enabling it to insure access to health care for the TRICARE beneficiaries in its region.

We additionally note that this result is manifestly consistent in purpose and effect with more traditional CHAMPUS reimbursement methods, which permit payment of capital costs along with additional payments for outlier cases.  32 C.F.R. § 199.14(a)(1).  Specifically, the regulations provide reimbursement greater than the standard DRG-rate for cost outliers and for length-of-stay outliers.  *Id.* at § 199.14(a)(1)(iii)(E)(1)(ii) (providing additional payment for "[a]ny discharge which has standardized costs that exceed a[n established] threshold"); *id.* at § 199.14(a)(1)(iii)(E)(1)(i) (additional payment for "[a]ny discharge . . . which has a length-of-stay (LOS) exceeding a threshold established").  The additional outlier payment in no way diminishes the provider's entitlement to capital payments under the same regulatory provision.  *Id.* at § 199.14(a)(1)(iii)(G).  Thus, Plaintiffs' receipt of both capital payments and inpatient reimbursement under the stop loss provisions runs consistent with the apparent intent of the regulators to appropriately reimburse more costly patient care.

---

[7]Neither the statute nor the regulations reveal a relevant distinction between an "MSC prime contractor" and an "MSC contractor" more generally.  The statutory provisions that, in part, establish the TRICARE program define "TRICARE Prime" as "the managed care option of the TRICARE program."  10 U.S.C. § 1079(g)(5); 10 U.S.C. § 1097a(f)(1).  Although those provisions make the definition applicable only to those sections, no more generally applicable definition of TRICARE Prime exists in the current statute or regulations.  Nor do the statute or regulations define "MSC Prime Contractor."  The Manual lends further support to this view in clarifying that the MCS Contractor is responsible for all TRICARE Prime, Extra, *and* Standard claims.  (*See* J.A. at 1006)

[8]On appeal, Defendant argues "there is no question that the parties can contractually eliminate the entitlement to Capital Reimbursement."  (Def.'s Br. at 28-29)  We agree.  Yet, while this may be true, Defendant does not identify any provision in the Agreement to this effect and, accordingly, the argument does little to advance Defendant's cause.

Other portions of the TRICARE / CHAMPUS regulations demonstrate the DOD did not intend to preclude capital payments to providers under special programs, even though they may be reimbursed in excess of government allowable rates. For example, under the Supplemental Care Program, a program related to CHAMPUS, the military provides payment for health care services rendered at civilian facilities for its active duty members. *See* 32 C.F.R. § 199.16(a)(2). The regulations implementing the Supplemental Care Program acknowledge that the CHAMPUS provider reimbursement regulations generally will guide payment and administration of Supplemental Care claims. 32 C.F.R. § 199.16(c). However, the regulations further establish exceptions and clarifications to the general rule. *See* 32 C.F.R. § 199.16(d). Specifically, the regulations clarify that "annual cost pass-throughs for capital . . . costs that are available under the CHAMPUS DRG-based payment system are also available, upon request, under the supplemental care program." 32 C.F.R. § 199.16(d)(4). Notwithstanding the entitlement to capital payments, that same subsection goes on to clarify that for some providers, "payment in excess of CHAMPUS allowable amounts" may be authorized. *Id*. at § 199.16(d)(5). Accordingly, the Supplemental Care Program regulations demonstrate that DOD contemplated simultaneous entitlement to capital payments and payments exceeding typical CHAMPUS allowable amounts.

In view of the foregoing, we hold that the regulations authorize capital payments to TRICARE preferred network providers regardless of the methodology employed to reimburse claims for inpatient care – whether it be the DRG-based system, or some alternative.

We next examine the significance, if any, of the capital payment certifications. Because the regulations authorize capital payments for all TRICARE / CHAMPUS providers, we find the certifications do not somehow operate to make Plaintiffs' application for and receipt of capital payments dispositive. Defendant would rely on Plaintiffs' capital payment certifications as evidence of mutuality of assent to modify the Agreement. To that end, Defendant seizes upon language contained on the capital payment certification forms and in correspondence between Plaintiffs and Defendant's government benefits administrator. The certification forms refer to TRICARE / CHAMPUS inpatient days as "[p]rovided in units subject to DRG-based payment," while the correspondence characterizes capital payments as "reimbursement . . . under the CHAMPUS DRG-based payment system." (*See, e.g.*, J.A. at 1294, 1299)

Looking first to the plain language of the regulations, we find that Plaintiffs' hospitals were "subject to the DRG-based payment system." The CHAMPUS regulations provide –

(ii) Applicability of the DRG system.
. . .
> (B) Services subject to the DRG-based payment system. All normally covered inpatient hospital services furnished to CHAMPUS beneficiaries by hospitals are subject to the CHAMPUS DRG-based payment system.
> . . .
> (D) Hospitals subject to the CHAMPUS DRG-based payment system. *All hospitals within the fifty states . . . which are certified to provide services to CHAMPUS beneficiaries are subject to the DRG-based payment system* except for . . . hospitals units which are exempt.

32 C.F.R. § 199.14(a)(1)(ii)(D) (emphasis added). Typically, only hospital units exempt from the Medicare Prospective Payment System are exempt from the CHAMPUS DRG-based payment system. *Id*. at § 199.14(a)(1)(ii)(D)(1)-(5). Additionally, "[a]ll hospitals subject to the CHAMPUS DRG-based payment system . . . may be reimbursed for allowed capital . . . costs by submitting a request to the CHAMPUS contractor." *Id*. at § 199.14(a)(1)(iii)(G)(3).

The capital payment provision of the CHAMPUS regulations lists the information required in order to verify the appropriate capital payment amount. Among this list, the regulation directs providers to submit "[t]otal inpatient days provided to all patients in *units subject to DRG-based payment*" and "[t]otal allowed CHAMPUS inpatient days provided in *units subject to DRG-based payment*." *Id*. at § 199.14(a)(1)(iii)(G)(3)(vi)-(vii) (emphasis added). The regulations notably do not define "DRG-based payment." Nor do the regulations clarify whether "DRG-based payment" in the former context refers collectively to Medicare and CHAMPUS inpatients, to some broader group, or to CHAMPUS alone.[9]

The Manual makes clear, however, that TRICARE uses the certification forms to insure that it does not pay capital costs for patients whose other (primary) health insurance fully covered the patient's charges. TRICARE / CHAMPUS Policy Manual, 6010.53-M, Ch. 6, Section 8 at III.B.3 (*available at* J.A. at 1053) (setting forth the method of calculating capital payment and noting "[t]hroughout these calculations claims on which TRICARE / CHAMPUS made no payment because other health insurance paid the full TRICARE / CHAMPUS-allowable amount are not to be counted"). The Manual details the steps that providers must follow in determining the "total allowable TRICARE / CHAMPUS capital payment for DRG discharges." *Id*. To begin, providers calculate the total TRICARE / CHAMPUS inpatient days. According to the Manual, providers should exclude –

(1) Any days determined to be not medically necessary, and

(2) Days included on claims for which TRICARE / CHAMPUS made no payment because *other health insurance paid the full TRICARE / CHAMPUS-allowable amount*.

*Id*. (emphasis added). Later in the same section, the Manual clarifies that TRICARE will not make capital payments for claims of dual-eligible beneficiaries that were paid by Medicare. *Id.* at B.4.f (*available at* J.A. at 1058) Rather, it expressly states that "TRICARE capital . . . cost payments will be made only on claims on which TRICARE is the primary payer." *Id*. Thus, the point of the certification forms is to separate the claims for which TRICARE / CHAMPUS serves as the primary payor from those where third parties foot the bill.

As careful review of the regulations makes abundantly clear, the CHAMPUS regulations were never thoroughly amended following implementation of the TRICARE program to allow for the possibility that MCS contractors would enter into alternative payment arrangements with health care providers in their networks. In fact, the DOD Final Rule implementing the TRICARE program proves as much. TRICARE Program; Uniform HMO Benefit; Special Health Care Delivery Programs, 60 Fed. Reg. 52,078-01, at 52,079 (Oct. 5, 1995) (now codified at 32 C.F.R. § 199.17) ("Our regulatory approach is to leave the existing CHAMPUS rules largely intact and to create new sections 199.17 and 199.18 to describe the TRICARE Program and the uniform HMO benefit."). As a result, the claims forms and the capital payment request forms that the TRICARE / CHAMPUS regulations require TRICARE providers to use essentially pound a square peg to a round hole. They simply do not neatly fit together.

Furthermore, as a strictly factual matter, Defendant's proffered capital payment evidence does not "tend[] to make the existence of any fact that is of consequence to the determination of the action more probable than it would be" otherwise. *See* Fed. R. Evid. 401. Importantly, the

---

[9]As the regulation provides, "All costs reported to the CHAMPUS contractor must correspond to the costs reported on the hospital's Medicare cost report." 32 C.F.R. § 199.14(a)(1)(iii)(G)(3). The term "DRG-rate" originated in Medicare. *See id.* at § 199.14(a)(1)(i)(A).

Agreement at issue remained in effect from August 6, 1996 to May 6, 2001. Accordingly, only Plaintiffs' certifications for purposes of capital payment during Fiscal Years (FY) 1997 through 2001 would even *arguably* be relevant. In Plaintiffs' FY 1997 submission, they certified 536 "[t]otal inpatient days . . . [b]ased on discharges within [the] reporting period." (J.A. at 1284) From FY1998-2000, when TRICARE modified the certification form to request "[t]otal TRICARE/CHAMPUS inpatient days . . . [p]rovided in units subject to DRG-based payment," Plaintiffs' certification forms did not set forth a number. (J.A. at 1299, 1343, 1378) Rather, on each occasion, Plaintiffs directed the government benefits administrator to "Use System Data." (*Id.*) In FY 2001, Plaintiffs failed to timely submit certification for capital payments. Thus, none of Plaintiffs' requests for capital payments during the relevant period affirmatively certified that the stop loss claims were "subject to DRG-based payment;" rather, Defendant's own government benefits administrator put forth the numbers that included Plaintiffs' stop loss inpatients. It strikes this Court as disingenuous that Defendant now seeks to rely on those certifications to establish mutuality of assent to modification of the Agreement, and communication of intent to waive its rights under the stop loss provisions. This is particularly so because evidence pre-dating and post-dating the relevant period clearly demonstrates that Plaintiffs applied for and received capital payments at times not covered by the Agreement.

Whether viewed as a legal conclusion or an evidentiary ruling, we affirm the district court's view on the significance of capital payment evidence.

## II.     ADDITIONAL CLAIMS ON APPEAL

On appeal, Defendant challenges several of the district court's conclusions of law, alleging: (1) Plaintiffs' application for and acceptance of capital payments effectively modified the contract such that the stop loss claims would be subject to the DRG-based payment system; (2) Plaintiffs waived their rights to payment under the stop loss provision and "decisively communicated . . . intent to waive" by certifying, for purposes of capital payment, that those "claims were subject to DRG-based payment," (Def.'s Br. at 38). Additionally, Defendant asserted defenses of equitable estoppel, failure to mitigate, and laches.[10] Finally, Defendant claims the district court abused its discretion in awarding prejudgment interest.

### A.     No Valid Modification Occurred

Defendant posits that Plaintiffs' application for and acceptance of capital payments effectively modified the contract. In Defendant's view, Plaintiffs demonstratively assented to modify the Agreement by certifying that the inpatient stop loss claims were "subject to the DRG-based payment system." Moreover, Defendant contends that the capital payments themselves constitute consideration. The district court concluded that "[t]he evidence did not reveal a meeting of the minds or an exchange of consideration necessary to support defendant's claim of modification." *Baptist Physician II*, 415 F. Supp. 2d at 851. We review the district court's conclusions of law *de novo*. *See Kalamazoo River Study Group*, 355 F.3d at 589. In doing so, we uphold the district court's determination that the parties did not validly modify the Agreement.

Tennessee substantive law controls in the instant case, as it comes before us on diversity. In Tennessee, the parties to an existing contract can modify its terms at any time. *Bonastia v. Berman Bros., Inc.*, 914 F. Supp. 1533, 1538 (W.D. Tenn. 1995). However, an existing contract cannot be unilaterally modified. *Balderacchi v. Ruth*, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1952).

---

[10]Although Defendant's "Statement of Issues" contemplates additional challenges to the district court's rulings, as we later note, Defendant waived them on appeal.

Rather, valid modification requires "the same mutuality of assent and meeting of the minds as required to make a contract" in the first instance. *Id.*; *see also Prudential Sec., Inc. v. Mills*, 944 F. Supp. 631, 635 (W.D. Tenn. 1996). Additionally, consideration must be exchanged to effect modification of an existing contract. *Boyd v. McCarty*, 222 S.W. 528, 529-30 (Tenn. 1920). Importantly for our purpose today though, "[p]erforming what was already promised in the original contract is not consideration to support a second contract." *Dunlop Tire & Rubber Corp. v. Serv. Merch. Co.*, 667 S.W.2d 754, 758-59 (Tenn. Ct. App. 1983) (citing *Am. Fruit Growers, Inc. v. Hawkinson*, 106 S.W.2d 564 (Tenn. Ct. App. 1937)).

To show mutual assent, Defendant relies on the certifications Plaintiffs submitted requesting capital payments. We cannot agree that the certifications manifest Plaintiffs' intent to modify the Agreement and forego payment under the stop loss provisions therein contained. As previously discussed at length, neither the statute, nor the implementing regulations, nor the policy manual preclude Plaintiffs, as preferred network providers, from requesting and receiving capital payments. This is so notwithstanding the operation of an Agreement establishing a negotiated rate of reimbursement for inpatient care which exceeds 100% of the DRG-rate. Although Defendant, and other MCS Contractors, can expressly provide that negotiated rates include costs otherwise additionally payable under the statute and regulations, such as capital costs, providers remain eligible to receive such additional payments upon request. *See* TRICARE / CHAMPUS Policy Manual, 6010.53-M, Ch. 6, Section 8 at III.B.4.d. (*available at* J.A. 1057-58).

Defendant analogizes the instant case to *Bonastia*. There, a company hired the plaintiff as an account manager and by letter conveyed that plaintiff's "annual salary will be $62,400 for the next two years." *Bonastia*, 914 F. Supp. at 1535. On his first day of work, the plaintiff signed a document acknowledging that he "read and received the company's Employee Handbook and agrees to abide by the policies, procedures, and rules it contains." *Id.* The document continues, however, and clarifies that the "Employee Handbook is not, and is not intended to be, a contract of employment," and that the plaintiff's "employment is 'at will.'" *Id.* Nearly a year later, the plaintiff signed yet another copy of the acknowledgment form. *Id.* Less than two years after reporting to work, the company terminated the plaintiff, who then sued for breach of an employment contract. *Id.* at 1535-36. The court in *Bonastia* assumed that the company's letter constituted a binding two-year employment contract, but found the second acknowledgment form modified that contract to create an employment at-will arrangement. *Id.* at 1538-39.

*Bonastia* is not on point. Defendant likens Plaintiffs' capital payment certifications to the acknowledgment form in *Bonastia*. The acknowledgment form indicates an agreement to comply with the policies and procedures of the Employee Handbook. The capital payment certifications, however, do not reference the regulations, policies, or procedures governing TRICARE / CHAMPUS and, even if they did, those regulations and policies comprise a complex federal regulatory scheme devoid of a definition of "DRG-based payment." Ambiguously, the phrase "units subject to DRG-based payment" appears at two places in the certification forms – both under "inpatient days" and under "total TRICARE/CHAMPUS inpatient days." (*See* J.A. at 1343) What is more, the information certified must comport with information submitted in the hospital's Medicare cost report and "DRG-based payment" is a phrase with its origins under the Medicare program. Thus, unlike the rather straightforward acknowledgment form in *Bonastia*, the signature of which could appropriately be taken to manifest intent, Plaintiffs' certifications for capital payment in the case at hand cannot be employed to demonstrate Plaintiffs' intent.

At any rate, Defendant cannot show valid consideration. The Agreement did not strip Plaintiffs of their entitlement to capital payment, even for the stop loss claims. In making capital payments to Plaintiffs, Defendant's government benefits administrator merely performed consistently with a pre-existing duty under the Agreement and the applicable regulations. *See*

*Dunlop Tire & Rubber Corp.*, 667 S.W.2d at 758-59. Additionally, under the TRICARE / CHAMPUS regulations and policies, Defendant's government benefits administrator made capital payments *independently* of Plaintiffs' regularly submitted claims for reimbursement under the Agreement. These constitute "pass-through" payments and, accordingly, although Plaintiffs submitted their capital payment requests to Defendant's government benefits administrator, the payments themselves flow directly from the federal government. *See* 32 C.F.R. § 199.14(a)(1)(iii)(G)(3) ("*CHAMPUS shall reimburse* the hospital its share of actual capital costs.") (emphasis added); *see also* General Accounting Office, Defense Health Program (DHP), B-287619, (July 5, 2001), http://redbook.gao.gov/17/fl0083859.php ("For payment of pass through costs, the contractor provides information to DOD to seek approval for payment. If DOD approves payment, the contractor is notified to pay the claim."). Thus, Defendant's claim of modification falls on two swords. We affirm the district court on this claim.

### B.      Plaintiffs Never Waived Their Rights

Defendant asserts that Plaintiffs waived their right to receive stop loss payments. To support this claim, Defendant states that, in early 1999, Plaintiffs knew of the stop loss underpayment and of Defendant's actions in capping those claims at 100% of the DRG-rate and, yet, did not terminate the Agreement. Defendant further relies on Plaintiffs' capital payment certifications as evidence of intent to waive. In fact, on more than one occasion, Defendant goes so far as to classify Plaintiffs' submission of capital payment requests as "unequivocal and decisive acts." (Def.'s Br. at 35, 37) The district court concluded, as a matter of law, that Plaintiffs did not "intentionally and knowingly waive[] their rights to receive payments pursuant to the stop loss provisions," nor did Plaintiffs "manifest any such intent." *Baptist Physician II*, 415 F. Supp. 2d at 851. Reviewing this issue *de novo*, *see Kalamazoo River Study Group*, 355 F.3d at 589, we agree with the district court that Plaintiffs did not waive their right to payment under the stop loss provisions.

Waiver is the knowing and intentional relinquishment or abandonment of a known right. *Gitter v. Tenn. Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969); *Faught v. Estate of Faught*, 730 S.W.2d 323, 325 (Tenn. 1987). There can, therefore, be no effective waiver of rights where a party either does not know its rights or fails to fully understand those rights. *Faught*, 730 S.W.2d at 326. Put another way, intent to waive is required. "Waiver may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct." *Reed v. Wash. County Bd. of Educ.*, 756 S.W.2d 250, 255 (Tenn. 1988); *see also Faught*, 730 S.W.2d.at 326; *Gitter*, 450 S.W.2d at 784. Where a party seeks to prove waiver by course of conduct, "there must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver." *Gitter*, 450 S.W.2d at 784 (citing *Webb v. Bd. of Trs. of Webb Sch.*, 271 S.W.2d 6, 19 (1954)).

Plaintiffs did not knowingly relinquish their rights to reimbursement. At the time Plaintiffs entered into the Agreement, Plaintiffs lacked the resources necessary to adequately monitor third party payor compliance with agreed-upon contract terms and, thus, to identify underpayments. To more closely track payments, Plaintiffs acquired new payment tracking software (PCMS) and hired a contract analyst whose primary task was to monitor payments. Plaintiffs loaded their contract with Defendant into the PCMS system in November 1998 and, in early 1999, Plaintiffs learned – through Hodge, its contract analyst – that Defendant had been reimbursing stop loss claims at an amount lower than the stop loss amounts.

Plaintiffs' contract analyst began conversations with Defendant in February 1999 to secure full payment of the stop loss claims. On July 22, 1999, she wrote to Defendant's government benefits administrator demanding full payment of the stop loss claims. Plaintiffs never

communicated an intent to waive Plaintiffs' rights under the Agreement, nor did Plaintiffs intend to waive those rights. By letter dated February 5, 2001, Defendant ultimately terminated the Agreement with Plaintiffs because they had reached an impasse on the amount due under the stop loss provisions. Additionally, Plaintiffs' request and receipt of capital payments cannot be deemed "clear, unequivocal and decisive acts . . . which show[] determination not to have the benefit intended." *See Gitter*, 450 S.W.2d at 784. Our exploration of the regulatory scheme underlying the TRICARE / CHAMPUS program proves as much. Consequently, we find that Plaintiffs did not waive their rights under the Agreement.[11]

### C.      Laches Does Not Bar Plaintiffs' Claim, Nor Did Plaintiffs Fail to Mitigate

The district court concluded that the doctrine of laches did not bar Plaintiffs' claim since Plaintiffs took action to obtain full reimbursement upon learning of the underpayment and filed suit "when [it] felt it had exhausted all options of receiving payment." *Baptist Physician II*, 415 F. Supp. 2d at 852. Additionally, the district court determined that, after learning of the breach, Plaintiffs did not fail to mitigate damages. Defendant challenges these conclusions. Again, we review *de novo*, *see Kalamazoo River Study Group*, 355 F.3d at 589, and Defendant's claims fail.

"[E]quitable defenses may bar purely legal claims." *M.J. Jansen v. Clayton*, 816 S.W.2d 49, 52 (Tenn. Ct. App. 1991). To successfully invoke the doctrine of laches, a defendant must show "an inexcusably long delay in commencing the action which causes prejudice to the other party," and mere delay will not suffice. *Patton v. Bearden*, 8 F.3d 343, 347 (6th Cir. 1993) (internal citations omitted); *see also M.J. Jansen*, 816 S.W.2d at 51. A finding of sufficient prejudice frequently follows from "the death of witnesses[,] . . . the loss of evidence," *M.J. Jansen*, 816 S.W.2d at 52 (collecting cases), or "failure of memory resulting in obscuration of facts" which "render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence." *Brown v. Ogle*, 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000).

Laches does not bar Plaintiffs' claim. Plaintiffs timely filed this suit within the applicable statute of limitations. *See* Tenn. Code Ann. § 28-3-109 (six-year statute of limitations). Moreover, Plaintiffs filed suit in December 2001 – ten months after Defendant notified Plaintiffs of its intent to terminate the Agreement following impasse, seven months after the effective termination date, and approximately two years and ten months following discovery of the underpayments. Up until February 1999, Plaintiffs did not know that Defendant was reimbursing its stop loss claims at below the agreed-upon rate. At that time, Plaintiffs' contract analyst began conversations with Defendant to secure full payment of the stop loss claims. On July 22, 1999, the analyst wrote to Defendant's claims administrator demanding full payment of the stop loss claims. This delay does not rise to the level of "inexcusably long." Further, Defendant has not shown that it suffered prejudice in the form of lost evidence, deceased witnesses, or failed memory sufficient to impede the truth-finding process. See *M.J. Jansen*, 816 S.W.2d at 52; *Brown*, 46 S.W.3d at 727.

Neither can Defendant succeed on its claim of failure to mitigate. The party alleging breach of contract "has a legal duty to exercise reasonable and ordinary care under the[] circumstances to prevent and diminish the damages." *ACG, Inc. v. Se. Elevator, Inc.*, 912 S.W.2d 163, 169 (Tenn. Ct. App. 1995). Although the injured party must take "reasonable and ordinary" steps to mitigate,

---

[11] Although Defendant's brief on appeal alludes to implied waiver, Defendant wholly fails to develop such an argument. Accordingly, Defendant has waived a challenge on implied waiver grounds. *See Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 448 (6th Cir. 2006) ("The courts of appeals are not self-directed boards of legal inquiry and research, but essentially arbiters of legal questions presented and argued by the parties."); *Indeck Energy Servs., Inc. v. Consumer Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

"[o]ne is not required . . . to make extraordinary efforts." *Id.* (citing *Arkansas River Packet Co. v. Hobbs*, 58 S.W. 278, 282 (Tenn. 1900)). Plaintiffs acted with "reasonable and ordinary care" by informing Defendant promptly upon discovery that, in their view, Defendant was in breach of the Agreement's stop loss provisions. Plaintiffs pressed their view in a subsequent letter and phone call with Defendant. Defendant concedes in its brief that it terminated the Agreement with Plaintiffs in February 2001 "because [Plaintiffs] insisted on being paid the full stop loss, and in excess of DRG." (Def.'s Br. at 21) Defendant knew of this insistence long before February 2001. Plaintiffs were not required "to make extraordinary efforts" to further clarify their position for Defendant's benefit. *See ACG, Inc.*, 912 S.W.2d at 169. Consequently, we find that the district court correctly ruled that the defense of laches does not bar Plaintiffs' claim, and that Plaintiffs took reasonable steps to mitigate.

## D.      Prejudgment Interest

Defendant further argues that the district court abused its discretion in awarding prejudgment interest because "[u]p to the day of trial the number and amount of stop loss claims was contested." (Def.'s Br. at 46) The district court awarded prejudgment interest at a rate of ten percent per annum "from the date that payment was actually posted on each inpatient claim" improperly reimbursed. *Baptist Physician II*, 415 F. Supp. 2d at 853. In so doing, the district court observed that Plaintiffs "ha[d] remained without the use of the money" and "[Defendant] could have entirely avoided the dispute . . . had it simply disclosed to [Plaintiffs] prior to signing the Agreement that it had no intention of paying more than CHAMPUS DRG on those claims." *Id.* On review, challenges to the district court's award of prejudgment interest "will not be disturbed . . . unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998); *see also Daily v. Gusto Records, Inc.*, 14 F. App'x 579, 591 (6th Cir. 2001) (noting that state law determines the appropriate standard of review). We find no abuse of discretion.

Where consistent with principles of justice and equity, Tennessee Code provides for the award of prejudgment interest at a rate not to exceed ten percent per annum. Tenn. Code Ann. § 47-14-123. First and foremost, principles of equity guide trial courts in exercising their discretion to award prejudgment interest. *Myint*, 970 S.W.2d at 927; *see also Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 447 (Tenn. 1992). Second, a trial court will more readily award prejudgment interest "when the amount of the obligation is certain, or can be ascertained by proper accounting." *Myint*, 970 S.W.2d at 927 (citing *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994)). Third, "interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds." *Id.* While useful as guideposts, the Tennessee Supreme Court has observed that "these criteria have not been used to deny prejudgment interest in every case where the defendant reasonably disputed the existence or amount of an obligation." *Id.*

The district court did not abuse its discretion in awarding prejudgment interest. First, the award is consistent with principles of equity. Defendant entered into the Agreement knowing full well it had no intention of ever paying over 100% of the CHAMPUS DRG-rate on the stop loss claims. Defendant deliberately failed to reimburse Plaintiffs according to the stop loss provisions, and thereby deprived Plaintiffs of the use of the difference in reimbursement. Second, the parties stipulated to the "accuracy, and admissibility" of a list detailing the inpatient claims at issue in the case. (J.A. at 1568, 1570-74) Thus, the amount of the obligation could be readily "ascertained by proper accounting." *See Myint*, 970 S.W.2d at 927. Finally, although Defendant disputed Plaintiffs' claim of breach, it did not "reasonably dispute" the claim in light of its intent from the start of the Agreement *not* to honor the stop loss reimbursement provisions contained therein. Accordingly, we find the district court did not abuse its discretion in awarding prejudgment interest.

### E.          **Claims Waived on Appeal**

At the outset, Defendant's brief contemplates challenges to the district court's conclusions on Defendant's equitable estoppel claim and its counterclaim.  However, Defendant's brief is notably devoid of any developed argumentation on these issues.  Accordingly, Defendant has waived these challenges.  *See Moore*, 458 F.3d at 448; *Indeck Energy Servs., Inc.*, 250 F.3d at 979.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order.