**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0237n.06

Filed: March 30, 2007

No. 05-6895

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MURRAY LAWRENCE, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| E. I. DU PONT DE NEMOURS & CO., | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before: COLE, SUTTON and COOK, Circuit Judges.

SUTTON, Circuit Judge. Murray Lawrence was exposed to a toxic cloud of chemicals while working as a welder at a chemical-processing facility owned by E. I. du Pont de Nemours and Company. DuPont conceded responsibility for the accident, and a jury awarded Lawrence $3.2 million in damages. On appeal, DuPont argues that Lawrence did not introduce sufficient medical evidence to prove that his injuries from the accident were permanent, that Lawrence's vocational expert's testimony was unduly speculative and that the verdict form was prejudicially defective. We affirm.

No. 05-6895
*Lawrence v. E. I. Du Pont De Nemours & Co.*

I.

For 24 years, Murray Lawrence worked as a free-lance welder, offering his specialized services to companies willing to buy his time. Because Lawrence was a skilled welder and because he was small enough to "weld all the tight spots," JA 94, he worked regularly and earned an average of $36,000 to $42,000 per year.

In early February 2003, Koch Specialty Plant Services Inc. contacted Lawrence and offered him an emergency welding job at a plant owned by DuPont in Old Hickory, Tennessee. Lawrence arrived at the job site on February 10 and welded for several days without incident.

On the morning of February 16, however, a toxic cloud of methyl benzoate, methyl p-toluate, orthoxylene and water vapor burst from the pipes at the plant and enveloped Lawrence as he walked to his work site. Exposure to such toxins may cause "cardiac stress, anemia . . . respiratory difficulties, mucosal hemorrhage, possible liver and kidney damage" and even death. JA 299. After Lawrence ran from the cloud and radioed his supervisor, a foreman took Lawrence to the plant's control room. Despite Lawrence's repeated requests for a doctor, DuPont employees waited four hours before taking Lawrence to see the company doctor. The company doctor gave Lawrence morphine for his headaches, took x-rays and tested Lawrence's blood, and he eventually told Lawrence that he could return "to work in the morning." JA 117.

The next morning, however, Lawrence saw another doctor, who gave him analgesics for his headache and placed Lawrence under a nebulizer to cool the burning sensation in his lungs. This

- 2 -

doctor referred Lawrence to a pulmonary specialist, who saw him the next day. The pulmonary specialist told Lawrence that he had "inflamed lungs[,] . . . a sinus infection, and . . . a rash on [his] neck." JA 125. The specialist also sent Lawrence to take a pulmonary function test at another hospital, but Lawrence could not complete the test because his "chest was hurting so bad." JA 125. Unable to work, Lawrence returned to his home in Fairhope, Alabama.

In Alabama, Lawrence's family doctor referred him to a local pulmonary specialist, Dr. Michael Houston, who with Dr. Frank Hixon treated Lawrence for the next few years. Dr. Houston administered breathing tests to Lawrence on February 27, 2003, which showed that Lawrence had developed asthma. A computed-tomography scan of his sinuses showed "substantial sinusitis," which ultimately prompted Dr. Hixon to perform a sinus endoscopy on Lawrence a few months later. JA 174. In August 2003, Dr. Houston diagnosed Lawrence with "[o]ccupational induced lung disease," "left maxillary sinusitis" and "some degree of reactive airway disease." JA 177. Dr. Houston thought that Lawrence's symptoms were caused by the accident at the DuPont facility, and he pointed out that the chemical exposure had at least aggravated Lawrence's underlying sinus condition.

In a November 14, 2003, letter, Dr. Houston suggested that Lawrence had reached maximum medical improvement—that, despite Lawrence's remaining respiratory symptoms, it was "as good as it's going to get . . . , which is intermittent symptoms." JA 206. In a January 5, 2004, letter, Dr. Houston noted that "it's quite obvious that [Lawrence] had a toxic gas exposure . . . . I believe it's imperative that Mr. Lawrence not be exposed to smoke or hazardous chemicals." JA 200. Dr.

Houston also explained that "I'm uncertain how he will be able to continue his position as a welder" unless "appropriate respiratory modifications can be made"—unless, in other words, there was a way he could work as a welder "without being in a smokey, dusty environment." JA 200–01.

In November 2004, Lawrence took a methacholine challenge test, which returned a negative result. Based on this test, Dr. Houston revised his diagnosis: Lawrence no longer showed signs of reactive airway dysfunction syndrome but still had "recurrent respiratory symptoms" and "recurrent sinopulmonary symptoms." JA 194–95.

On February 11, 2004, Lawrence filed this lawsuit against DuPont, claiming that DuPont's negligence exposed him to toxic fumes and caused a variety of injuries, some of them permanent. At trial, DuPont admitted negligence, and both parties agreed that the sole issue for the jury was the determination of damages arising from the accident.

Lawrence relied on Dr. Houston as his medical expert. Among other things, Dr. Houston testified that Lawrence still suffered from recurrent respiratory and sinopulmonary problems, had reached maximum medical improvement in his condition, and should not be exposed to fumes, smoke, dust or other irritants. Dr. Houston could not say whether Lawrence's "intermittent recurrent respiratory symptoms" were "permanent or not," JA 213, but when asked if he had an "opinion as to any type of permanent condition with his sinusitis[] and . . . his pulmonary condition," Dr. Houston noted that Lawrence would have "long-term issues in employment, . . . I think he's going to have major problems with being exposed . . . to common things that a welder is exposed to," JA

185. He also expected that Lawrence's sinusitis would aggravate his asthma. Dr. Houston linked all these problems to Lawrence's exposure to methyl p-toluate at the DuPont facility. *See* JA 172 ("I don't think anyone is sure how much [Lawrence] was exposed to, [but it was] enough to . . . cause[] substantial problems."). Reviewing his treatment of Lawrence, Dr. Houston noted that he had previously prescribed Accolate, Allegra D, Astelin, Flonase, Prednisone, Singulair, Tylenol 3 and Zyrtec for Lawrence's sinus problems; Accolate, Albuterol, Combivent and Qvar for Lawrence's asthma; Advair, Flovent, Prednisone and Singulair for Lawrence's other pulmonary symptoms; and Augmentin and Quinoline as antibiotics. As of January 4, 2005, Lawrence was still taking Astelin, Albuterol and Quinoline.

Dr. Houston stressed that Lawerence "can't be in a dusty, smoky environment. He needs to be trained to do something else. That's what he needs. He needs . . . a new occupation." JA 187. Dr. Houston said that he did not believe a welder could avoid "fumes and the smoke and this dust," JA 178, and that short of a "wind tunnel" or a "bubble," he could not see any modifications that could be made to allow Lawrence to return to his job as a welder, JA 204. All in all, because Lawrence needed a "dust-free, irritant free, respiratory irritant free environment," JA 210, Dr. Houston testified that Lawrence is now "unable to work as a welder," JA 178.

Dr. Roy Johnson testified as DuPont's medical expert. Based on an April 29, 2005, examination of Lawrence and laboratory results, Dr. Johnson concluded that the chemical exposure at the DuPont facility had "probabl[y] aggravat[ed] . . . preexisting sinusitis" so that Lawrence now had "recurrent sinusitis." JA 342. He explained that the exposure had likely caused Lawrence's

reactive airway dysfunction syndrome, but that this condition had likely resolved itself. "Lawrence potentially could continue to work as a welder," Dr. Johnson said, "if some reasonable job modifications could be made, such as use of a local exhaust system, a power air purifying respirator, isolation or enclosure." JA 324.

Lawrence himself testified that the ventilation systems proposed by Dr. Johnson were unrealistic and that, with such restrictions, he would never find a job as a welder. Since his sinus surgery, Lawrence's sinuses "drain from the back," clogging his throat, "chok[ing] [him] at night" and inducing coughing attacks. JA 143. His lungs sometimes "close up" and "get[] real sore" so that he "can't stand for someone to touch [him] in [the] chest." JA 124. He testified that he sometimes gets a "burning sensation in his throat when [he] cough[s]" and that his chest frequently tightens up and "burns all night." *Id.* He also has "blurred vision in [his] left eye." JA 153. Lawrence stated that he had worked odd jobs around his home town since the accident and that he was taking five or six medications a day to treat his respiratory ailments. The medications make Lawrence "very forgetful" and "confused," JA 144, and give him "bad diarrhea" and "headaches," JA 145. In short, Lawrence can no longer perform many routine activities—such as cleaning the bathroom with a chemical solvent like Tilex, jogging or playing with his three-year-old son—without significant difficulties.

Lawrence also called David Strauser, a vocational expert, to testify about Lawrence's lost future earnings and vocational disability. He said that the "work life expectancy" of someone Lawrence's age was 13.4 years, but that most individuals would work a full 16 years to the age of

65. JA 242. Noting that Lawrence was unable to work as a welder, Strauser calculated Lawrence's post-accident yearly earnings to be $18,200. Concluding that Lawrence could have earned $42,000 a year as a welder had he not been injured, Strauser calculated Lawrence's loss of earning capacity to be between $318,920 and $380,800, depending on when Lawrence retired. JA 243. "Clearly," he said, "Lawrence has suffered a loss in his earning capacity as a result of the injuries he sustained at the DuPont facility." JA 244.

At the end of the trial, DuPont asked the district court to include several questions on the verdict form. One of them asked the jury if Lawrence had a "permanent sinus injury"; another asked if Lawrence had a "permanent [lung] injury." JA 36–37. The district court rejected both proposed questions. It instead gave the jury a special verdict form that read:

> We, the jury, unanimously find that the defendant DuPont is liable to the plaintiff for the following damages, which have been proven by a preponderance of the evidence:
>
> **Non-Economic Damages:**
> (a) Pain and suffering — past             $_____
> (b) Pain and suffering — future           $_____
> (c) Permanent impairment                $_____
> (d) Loss of the ability to enjoy life — past    $_____
> (e) Loss of the ability to enjoy life — future   $_____
>
> **Economic Damages:**
> (f) Medical care/services — past           $_____
> (g) Medical care/services — future        $_____
> (h) Loss of earning capacity — past       $_____
> (i) Loss of earning capacity — future     $_____

**TOTAL**                                                        $_____

JA 83–84.  The jury returned a verdict of $3,174,627 in damages for Lawrence, which included

$400,000 for permanent impairment, $1,997,725 for future pain and suffering, loss of enjoyment and

medical expenses and $327,030 for loss of future earning capacity.  The trial court rejected each of

DuPont's motions for judgment as a matter of law as well as its motion for a new trial.

## II.

We give fresh review to the denial of DuPont's renewed motion for judgment as a matter of

law.  *Estate of Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 408 (6th Cir. 2005).  And we

review the denial of DuPont's motion for a new trial for an abuse of discretion.  *Anchor v. O'Toole*,

94 F.3d 1014, 1021 (6th Cir. 1996).

## A.

DuPont first challenges the sufficiency of the evidence, questioning whether it supports the

jury's conclusion that Lawrence's injuries were permanent.  As the company sees it, Lawrence's

medical evidence was "equivocal," "self-contradictory" and ultimately insufficient to submit the case

to a jury.  Br. at 13.  As we see it (or at least as we believe a reasonable jury could see it), the medical

evidence supports a damages award premised on permanent injuries.

As a federal court sitting in diversity, we follow the state-law rules governing evidentiary

challenges to the jury verdict.  *See* 28 U.S.C. § 1652; *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79

- 8 -

(1938); *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). Under Tennessee law, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). A verdict, however, cannot be based on pure conjecture, *Reserve Life Ins. Co. v. Whittemore*, 442 S.W.2d 266, 274 (Tenn. Ct. App. 1969), and to submit the "issue of permanency of all but the most obvious injuries" to a jury, Tennessee law requires expert medical testimony on the subject, *Owens Ill., Inc. v. Lane*, 576 S.W.2d 348, 350 (Tenn. 1978); *see also Miller v. Willbanks*, 8 S.W.3d 607, 615 (Tenn. 1999).

Once we give Lawrence the benefit of "all reasonable inferences to sustain the verdict," as we also must do under Tennessee law, *Alley v. McLain's Inc. Lumber & Constr.*, 182 S.W.3d 312, 316 (Tenn. Ct. App. 2005) (internal quotation marks omitted), we believe that the jury had sufficient medical evidence from which to conclude that Lawrence's injuries were permanent and that he would sustain damages from his injuries in the future. Dr. Houston, Lawrence's medical expert, testified that the chemicals at the DuPont facility had caused, or at least substantially aggravated, Lawrence's respiratory and sinus problems. And Dr. Houston gave every indication that these problems were permanent: Lawrence had reached the maximum medical improvement since the injury and yet still suffered from recurrent respiratory and sinus problems that required him to avoid smoke, chemical fumes and dust. Dr. Houston also repeatedly testified that Lawrence would have "long-term issues in employment," JA 185, because he needed a "dust-free, irritant free, respiratory irritant free environment," JA 210, which (as other evidence confirmed) was simply unavailable to

a welder. *See* JA 178, 185, 187, 200, 203–04. Even DuPont's own medical expert, Dr. Johnson, acknowledged that Lawrence had "recurrent sinusitis within reasonable medical probability," JA 325, and that at most Lawrence could "potentially" return to his work as a welder but only with substantial accommodations, JA 324. *See also* JA 342 (diagnosing Lawrence with "recurrent sinusitis"); *cf. Barron v. State of Tenn. Dep't of Human Servs.*, 184 S.W.3d 219, 222 (Tenn. 2006).

DuPont responds that Dr. Houston's testimony cannot support the verdict because he never declared that Lawrence's injury was permanent "within a reasonable degree of medical certainty." Br. at 18. Tennessee law, however, does not have an unyielding requirement that expert medical opinions be phrased only in terms of a "reasonable degree of medical certainty." "[N]othing in Tennessee law requires that those or any other specific words be recited in order for expert testimony to be admissible." *State v. Young*, No. 01C01-9605-CC-00208, 1998 WL 258466, at *22 (Tenn. Crim. App. May 22, 1998); *see also Mitchell v. Ensor*, No. W2001-01683-COA-R3-CV, 2002 WL 31730908, at *11 (Tenn. Ct. App. Nov. 18, 2002); *Jackson v. Allen*, No. M2000-01673-COA-R3-CV, 2002 WL 661930, at *2 (Tenn. Ct. App. Apr. 23, 2002). While the absence of *any* reliable medical testimony will condemn a verdict, the record "in its entirety" must be bereft of competent medical evidence in order to prohibit a finding of permanent injury. *Barron*, 184 S.W.3d at 222. *Compare, e.g.*, *Singleton v. Procon Prods.*, 788 S.W.2d 809, 811–12 (Tenn. 1990) (overturning award when doctor merely stated that permanence was "possible"); *Owens Ill.*, 576 S.W.2d at 350 (overturning award when permanent injury was "just a possibility"); *Int'l Yarn Corp. v. Casson*, 541 S.W.2d 150, 152 (Tenn. 1976) (overturning award when injuries "may be with [plaintiff] for the rest

of her life, or they may not be, depending on what the future holds"); *Md. Cas. Co. v. Young*, 362 S.W.2d 241, 243 (Tenn. 1962) (overturning award when the injury "could" be permanent and that it was "very possibl[e] . . . but I couldn't tell you more [than] that"); *Porter v. Green*, 745 S.W.2d 874, 877–78 (Tenn. Ct. App. 1987) (overturning award when doctor stated that "we don't know what's wrong with [one plaintiff], even to today" and "I'm almost sure [the other plaintiff] has some chronic problem"); *with Walker v. Saturn Corp.*, 986 S.W.2d 204, 207 (Tenn. 1998) (upholding award when doctor restricted plaintiff's use of her right thumb based on a "chronic" condition); *Hill v. Royal Ins. Co.*, 937 S.W.2d 873, 875–76 (Tenn. 1996) (upholding award when doctor required that plaintiff no longer work near a particular chemical); *Jones v. Walters*, 1989 WL 54103, at *2 (Tenn. Ct. App. May 23, 1989) (upholding award even though doctor admitted that plaintiff could "spontaneously get better with time").

Even if Tennessee law does not require medical testimony concerning the permanence of an injury to be phrased in terms of a "reasonable degree of medical certainty," DuPont points out that Dr. Houston expressly disclaimed that the injury was permanent. Dr. Houston, DuPont notes, gave this equivocal response—"I can't tell you if it's permanent or not," JA 213—when DuPont asked him on cross-examination, "Are you able to state within a reasonable degree of medical certainty whether or not [Lawrence's recurrent respiratory symptoms] [are] permanent?" But in view of the specific question that DuPont's counsel asked Dr. Houston as well as the remainder of Dr. Houston's testimony, *see Int'l Yarn*, 541 S.W.2d at 152 ("[T]he testimony of the witness must be considered in its entirety . . . ."), it is clear that Dr. Houston was addressing Lawrence's *respiratory* symptoms

(*i.e.*, his lung condition), not Lawrence's recurrent sinusitis (*i.e.*, his sinus condition). At most, this question thus undermines the weight of the medical evidence regarding the permanence of Lawrence's respiratory symptoms, not the permanence of his sinus conditions. *See Gardner v. Steinforth*, No. 01A01-9307-CV-00327, 1994 WL 55365, at *4 n.1 (Tenn. Ct. App. Feb. 25, 1994) (noting that doctor's equivocal testimony "weaken[s]" but "do[es] not completely destroy" reasonably certain medical testimony elicited earlier).

DuPont further contends that Dr. Houston's testimony was "internally inconsistent" and therefore cannot be credited at all. Br. at 26. While "[c]ontradictory statements of a witness in connection with the same fact have a result of cancelling out each other" under Tennessee law, *Tibbals Flooring Co. v. Stanfill*, 410 S.W.2d 892, 896 (Tenn. 1967), Dr. Houston's statements regarding the permanence of Lawrence's injury do not suffer from this defect. He consistently maintained that Lawrence needed a "dust-free, irritant free, respiratory irritant free environment," JA 210, that Lawrence could not return to his work in any other environment, that Lawrence had reached maximum medical improvement and that Lawrence had "recurrent sinopulmonary symptoms," JA 195. As a result of the accident, Lawrence now faced long-term pain and suffering—including sinus drainage, aggravated asthma, coughing attacks, a "burning sensation" in his throat and chest, JA 124, and "blurred vision" in one eye, JA 153—and needed to take several medications that made him "very forgetful" and "confused," JA 144, and gave him "bad diarrhea" and "headaches," JA 145.

DuPont persists that Dr. Houston acknowledged that Lawrence was "able to return to gainful employment" in a November 2003 letter, JA 205, which (DuPont claims) is necessarily inconsistent with his other testimony given that Lawrence was a welder and given that the most likely "gainful employment" to which Lawrence would return was work as a welder. This argument, however, hardly gives Lawrence the benefit of all reasonable inferences and, worse, ignores the context in which Dr. Houston wrote the letter. Just three months before writing this letter, Dr. Houston had diagnosed Lawrence with "[o]ccupational induced lung disease" and "reactive airway disease," JA 177, casting doubt on whether he would be able to work at all—in any profession. In the interim, Lawrence's medical condition improved, prompting Dr. Houston to conclude that Lawrence could now work, but not necessarily that he could work as a welder. In the historical context of Dr. Houston's treatment of Lawrence, in the context of a record in which all agreed (including Dr. Houston) that Lawrence could not return to a work environment that contained dust, chemical fumes or smoke and in the context of a record in which ample evidence showed that it was impractical for welders to insist on working in an environment free of dust, chemical fumes or smoke, it becomes clear that Dr. Houston's letter conveyed the point that Lawrence could now work in *some* capacity, not that he could return to work as a welder. On this record, the jury could consider Dr. Houston's testimony and could rely on it in awarding damages premised on permanent injuries to Lawrence.

B.

DuPont seeks a new trial on the ground that Strauser's loss-of-earning-capacity calculations were unduly speculative. *See John E. Green Plumbing & Heating Co., Inc. v. Turner Constr. Co.*,

742 F.2d 965, 968 (6th Cir. 1984) (prohibiting damage awards based solely on "mere speculation, guess, or conjecture"). The record undermines this argument: Lawrence testified that, on average, he earned between $36,000 and $42,000 per year; Lawrence's tax return showed that his actual salary for 2002 ($36,875) fell within that range; DuPont failed to introduce any evidence to the contrary; and Strauser candidly explained to the jury that he used the top of Lawrence's salary range in preparing his calculations. The range that Strauser presented to the jury (from $318,920 to $380,800) thus represented a reasonable, not a speculative, estimate of Lawrence's lost earning capacity, and the jury's award at the low end of that range ($327,030) shows that it critically considered Strauser's expert testimony rather than unthinkingly speculating about an appropriate award.

DuPont separately maintains that the jury verdict on loss of future earning capacity must be vacated because the final figure of $327,030 "is not adjusted to the present value as required by the jury instructions." Br. at 42. Besides saying that this is what happened, however, DuPont offers no reason—record supported or otherwise—to doubt the jury's good faith in following the court's instructions regarding the present value of any award. *See* JA 484 ("[Y]ou must adjust the award of [future] damages to allow for the reasonable earning power of money and the impact of inflation."). And although DuPont critiques the award on the ground that the jury did not pick the low or high end of Strauser's range (but rather a number in between), the fact remains that Strauser never testified that these were the only alternatives available. In the final analysis, the law requires only the "degree of certainty that the nature of the case admits," *John E. Green Plumbing & Heating*

*Co.*, 742 F.2d at 968 (internal quotation marks and brackets omitted), and the jury award falls well within this modest—and necessarily flexible—requirement.

C.

DuPont also seeks a new trial on the ground that the special verdict form did not say that "permanency of injury [was] a necessary predicate to a finding of future damages," making the form prejudicially misleading. Br. at 33. We disagree.

Although general verdicts are the norm, a district court "may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact." Fed. R. Civ. P. 49(a). When a court uses a special verdict form, it must explain the form in a way that "enable[s] the jury to make its findings upon each such issue." *Id.*; *cf. Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559 (6th Cir. 2001). We leave the decision to use a special verdict to "the sound discretion of the trial court," *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 465 (6th Cir. 1999), just as we do with respect to the "discretion" of district courts to "draft[] jury instructions" generally, *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000).

Broad as the trial court's discretion may be in choosing a verdict form, it is not unlimited. If the instructions and special verdict form, taken together, are "confusing, misleading and prejudicial," we will require the district court to hold a new trial. *Hostetler v. Consol. Rail Corp.*, 123 F.3d 387, 393 (6th Cir. 1997); *see also United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1027–28 (6th Cir. 2003).

The special verdict form used by the district court in this instance did not run into any of these problems. By stipulation of the parties, the verdict form did not ask if DuPont was negligent. It instead listed nine categories of damages that the jury could award. By distinguishing among these categories of damages that the jury *could* award, the form ensured that the jury could award certain damages (such as "permanent impairment" or "loss of earning capacity — future") only if Lawrence had proved his entitlement to each of them "by a preponderance of the evidence." JA 83.

At least one Tennessee appellate court has approved a similar form—and language—when parties disputed the damages arising from an injury. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 713 (Tenn. Ct. App. 1999) (approving a special verdict form that states: "If [the defendant is liable], set forth the amount of damages, if any, you find have been proven by a preponderance of the evidence in each of the following categories," followed by a list of the nine categories of damages used here). The form used by the district court also closely follows one approved by the Tennessee Judicial Conference. *See* 8 Tenn. Prac. Pattern Jury Instr. T.P.I.–Civil Appendix B, Form 3, at 579–80 (2006) (stating in relevant part: "Decide the total amount of damages sustained by plaintiff. . . . What amount of damages, if any, which have been proven by a preponderance of the evidence," and listing the nine categories of damages at issue here).

The district court, moreover, removed any lingering risk of confusion from the use of this form through its instructions to the jury. The district court instructed the jury (1) that Lawrence was only "entitled to recover compensation for any injury that was legally caused by the negligent conduct of DuPont," JA 481; (2) that the jury should "not duplicate damages for any element by also

including that same loss or harm in another element of damage," *id.*; (3) that if Lawrence had a preexisting condition, then he was "entitled to recover damages only for any aggravation of the preexisting condition," JA 482; (4) that Lawrence had to "prove the future effect of [his] injury with reasonable certainty" and that the jury could not rely on "mere conjecture or . . . possibility," JA 483; and (5) that the jury should "enter either zero or an amount of money for the various kinds of injury" described on the verdict form, JA 485. These instructions thus properly made clear what the jury could, and could not, do in awarding each type of damages, removing any risk of confusion about the verdict form.

"To allow the jury to conclude that Lawrence has a permanent injury without specifying what injury he has," DuPont persists, "forced the jury to speculate . . . about Lawrence's current condition." Br. at 36. Yet a general verdict form—which, as DuPont acknowledges, is the norm—would not solve *that* problem. And DuPont offers no explanation why the special verdict used here required any more speculation than a general verdict would require. No less importantly, it did not take speculation to conclude that Lawrence suffered a permanent injury. As we have shown, Dr. Houston linked Lawrence's recurrent sinusitis to the accident at the facility and repeatedly asserted that Lawrence could work only in a "dust-free . . . respiratory irritant free environment." JA 210. And because of his long-term injuries, Lawrence testified that he now deals with sinus drainage; aggravated asthma; coughing attacks; a "burning sensation" in his throat and chest, JA 124; and "blurred vision" in one eye, JA 153; and needs to take several medications that make him "very forgetful" and "confused," JA 144, and give him "bad diarrhea" and "headaches,"

JA 145.  In the face of the medical evidence, it is speculation only *on our part* that would allow us to conclude that the jury based its decision on conjecture.

## III.

For these reasons, we affirm.