DISSENT
SUTTON, Circuit Judge,
dissenting.
It is tempting to join the court’s decision to reverse this $10,000 verdict and to go along with its conclusion that Pittington is entitled to more damages (apparently somewhere between $10,000 and $35,000) and is entitled to more prejudgment interest (apparently something more than $228). The financial stakes are not high. But I cannot “rebuke[ ]” the district court, supra at 800-01, for taking this case as it came to her. Perhaps because of the relatively small amount of money sought by Pittington, his counsel introduced some evidence of damages and neglected many other sources of evidence, making it exceedingly nebulous for anyone—jury, district court judge, appellate judges—-to be sure about what he fairly deserved. And perhaps because of those modest stakes, his counsel made only one argument about prejudgment interest—that he-was'entitled to a 10% per year interest award on the judgment, a princely rate of return if you could get it during the time at hand. Under these circumstances, the district court judge did not exceed her considerable discretion in rejecting Pittington’s request for a new trial on damages and in rejecting his request for a 10% prejudgment interest award on the judgment.

Backpay award. Pittington bases his argument on a black-letter principle: that Lumberjack, the defendant, had the burden to show that he, the plaintiff, failed to mitigate damages. Rasimas v. Mich. Dep’t of Mental Health, 714 F.2d 614, 623-24 (6th Cir. 1983). But he fails to apply that principle .correctly. He first ignores the reality that, in a burden-shifting framework, the burden must shift from somewhere. In this case, Pittington had to start by showing the amount of pre-mitigation backpay Lumberjack owed within a “reasonable certainty.” Blackwell v. Sun Elec. Corp., 696 F.2d 1176, 1192 (6th Cir. 1983). That meant he had to show what wages he received before the discharge. Despite defense counsel’s prodding, he never testified or submitted evidence that he earned more than $8 per hour while working for Lumberjack. The jury readily could have found that Pittington never proved that he received $10.50 per hour at the time he was fired and thus reduced the pre-mitigation amount accordingly.
If I understand the court’s contrary conclusion, it turns on a question asked by *810 Lumberjack’s counsel. See R. 74 at 48-49 (Defense counsel: “I think—your testimony is, I think, you received two promotions, but did you not go from . $8 to $10,50 once you went to a lead, and there was.no other pay raises?” Pittington: “I’d have to see the paper. I don’t recall off the top of my head.”);, supra at 802-03. But questions are not answers. And questions are not evidence. The only .person, in the exchange who could answer the question— and provide evidence about the point—was Pittington. Yet he demurred. Before thaj; and after that, for reasons of their own, Pittington and his counsel never introduced evidence on the point during his direct or redirect' examination. .No W-2s. No pay stubs. No income returns. No documentation of any sort. All of which could make a reasonable jury skeptical about anything Pittington said about jobs and pay. On- this record, • a jury reasonably could find that he never earned more than $8 per hour.
Pittington next misapprehends Lumberjack’s burden. As he sees it, Lumberjack must offer its own evidence—from its own witnesses—to meet its lack-of-mitigation burden. But the rule describes a destina-' tion, not the path to take. Lumberjack was free to rely on Pittington’s sworn testimony to carry its burden. His statements are record evidence upon which Lumberjack, the jury, and the district court could rely. Pittington testified on direct examination about three different jobs he held after being fired from Lumberjack. A jury could infer from the existence of those jobs that “substantially equivalent positions” existed in Pigeon Forge. Rasimas, 714 F.2d at 624. To the extent anyone has concerns about the clarity of that testimony, it must be construed in favor of the verdict. See Ross v. Meyers, 883 F.2d 486, 488 (6th Cir. 1989). On top of that, Pittington admitted that he “wouldn’t say it’s hard to keep a good job” in Pigeon Forge. R. 74 at 6-7. Lumberjack’s counsel featured this evidence in his closing argument when he said that 35 weeks, the longest period of unemployment, was “a long time to not get a job in Pigeon Forge.” R. 95 at 15-16. And Pittington described his job-seeking efforts during one period of unemployment but conspicuously failed to describe his search during any other periods—including the 35-week stretch. A reasonable jury could infer from his testimony that he “failed to use reasonable care and diligence in seeking such positions.” Rasimas, 714 F.2d at 624. The best evidence on mitigation came from Pittington’s mouth to the jury’s ears. The jury was free to listen to it and rely on it.
Pittington also fails to come to grips with the deferential standard of review for challenging the amount of a jury award under Civil Rule 59. The district court may overturn a jury award only if the number is “substantially less than unquestionably proved by the plaintiffs uncontradicted and undisputed evidence.” Anchor v. O’Toole, 94 F.3d 1014, 1021 (6th Cir. 1996). Appellate courts in turn review that decision for an abuse of discretion. Nat’l Ecological Found. v. Alexander, 496 F.3d 466, 476 (6th Cir. 2007). Pittington did not meet that doubly deferential standard of review.
The jury’s award also makes sense for what it is worth. The district court mentioned one possible path to $10,000, noting that this figure corresponded to what he would have earned between his firing and his first post-Lumberjack job. But there are many others. Try this one. The jury could have looked at the sparse record (Pittington did not submit the paperwork he received during discovery about his job and salary, presumably because it would have limited his request for damages) and Pittington’s own testimony to use the $8 hourly wage when calculating pre-mitigation backpay. Then it could have multiplied *811 that number by 40 hours per week for 52 weeks per year over three years to establish a pre-mitigation amount.of $49,920. Then it could have relied on Pittington’s testimony to calculate and deduct post-Lumberjack interim earnings from that gross amount. See NLRB v. Jackson Hosp. Corp., 557 F.3d 301, 307-08 (6th Cir. 2009). Pittington often gave a range of dates and wages when describing his interim employment and the jury could have based the interim pay calculations on the longest working periods and highest rates he had estimated. See, e.g., R. 74 at 3 (noting that he left Perry Smith “[m]aybe the end of August, beginning of September” of 2013). Then it could have calculated that Pitting-ton earned $7.25 per hour for six months’ work at Perry Smith Development, two payments of $500 from Cyrus Family Theater, and $600 per week over nine months from Sablé Equestrian Theater for a total interim income of $28,980. That would leave $20,940. Next the jury could have relied on Pittington’s concession that it is not hard to get a job. in Pigeon Forge and that-he could not explain how, or if, any job search efforts came up short, to decide that he failed to mitigate damages during the 35-week stretch of unemployment. The jury could then have subtracted $11,200 from the $20,940 to account for that failure to mitigate, which gets to a rough (rounded up) award of $10,000.
The exact path to $10,000 of course does not matter. What matters is that the path, indeed paths, exist. See Anchor, 94 F.3d at 1021. The evidence does not show that the jury unquestionably erred.
Any other approach runs the risk of disrespecting the jury’s and district court’s ring-side view of the case. We review transcripts for a living. They review witnesses and their credibility for a living. We have a comparative advantage on law. They have comparative advantages on facts. Pitting-ton does not -challenge a single jury instruction. He challenges only how the jury and district court saw the evidence. No appellate court can recreate what the jury saw and the trial judge witnessed, which is why the standard of review is so deferential and why it is so. unconventional to reverse jury trial awards.
It’s not just disrespect of juries and trial judges that should concern us. We also run the risk of rewarding a strategic choice gone awry. Pittington chose not to' add W~ 2s, pay stubs, tax returns, or other typical evidence to the record. Perhaps he feared what those documents might reveal about his pay, working hours, or relationship with Lumberjack—including matters that might go to whether the undérlying merits of his claim' were even valid. Just the same, he chose not to propose alternative methods by which the jury might have calculated an award. He just asked for $40,000, which the majority agrees would have been too much. Perhaps he feared that the jury'would seize on any alternative that might result in a lower number. All we know for sure, and all that matters, is that he chose to rely on spotty testimony and his lawyer’s skill to make the case that $40,000 was the correct amount. By making that strategic choice, he forfeited the opportunity to present additional evidence or argue in the alternative for different amounts. See Estate of Quirk v. Comm’r of Internal Revenue, 928 F.2d 751, 758 (6th Cir. 1991).
The jury .was free to review the evidence and decide what amount of damages he had shown, including perhaps by compromising among competing ways of looking at the evidence, from the perspective of the individual jurors. If reasonable judges can see the same case differently, it shouldn’t surprise anyone that reasonable jurors sometimes see the. same evidence differently. And we should respect efforts to *812 resolve those differences so long as the final outcome hews to the bounds of plausibility. As the Seventh Circuit has pointed out in a different context, but one also focused on deference, “a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.” Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988). Perhaps that overstates matters, both the olfactory role in reviewing jury verdicts and the stench needed to second guess a jury and trial judge. But you get the idea. Something must go seriously awry before we will reverse a jury’s and district court’s unimpeded view of the evidence and their assessment of it. No such problem happened here. I would respect the verdict.

Pre-judgment interest. Our review of a district court’s decision about pre-judgment interest also is deferential—and also rarely reversed. The court may award prejudgment interest “at its discretion in accordance with general equitable principles,” and we again review the decision for an abuse of discretion. Rybarczyk v. TRW, Inc., 235 F.3d 975, 985 (6th Cir. 2000). A district court may apply the post-judgment rate under 28 U.S.C. § 1961 if the court finds it warranted after considering case-specific factors such as inflation, interest rates, the possibility of a windfall payment, and the goal of making the plaintiff whole. See Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan, 711 F.3d 675, 686 (6th Cir. 2013). The district court chose the federal rate only after explicitly highlighting those factors in its opinion. R. 87 at 6 (“The court finds that plaintiffs request for interest at the effective rate of 10% per annum, which is permissible under Tennessee law, would be a windfall, particularly in light of the low rates of interest and inflation over the relevant period.”); see supra at 807-09. This was not the first district court to apply § 1961 to pre-judgment awards, and we have blessed that choice before. See, e.g., Ford v. Uniroyal Pension Plan, 154 F.3d 613, 619 (6th Cir. 1998). No abuse of discretion happened here either.
Making the case easier, Pittington forfeited any contrary argument. In what looks like another strategic decision, Pit-tington argued only for the 10% rate when he moved to alter the judgment. Nowhere in his briefs did he argue below that the district court should have used any other method to calculate pre-judgment interest if the state rate seemed too high. He instead limited’ his claim to the highest amount for which he could realistically hope: the state rate. Generally speaking, district courts do not make reversible errors when they ignore arguments never made.
In reaching a contrary conclusion, the court seizes on this language in Pitting-ton’s lower court briefs: “Regardless of the rate and method the Court chooses to utilize, Mr. Pittington simply requests that the Court compensate him as completely as possible in light of the circumstances of this case.” R. 83 at 6; supra at 807. That does not suffice to preserve this argument or any other for appeal. A litigant does not preserve an argument by making a general request for relief. Even that general idea, worse yet, made its first appearance in a reply brief, which does not preserve an issue for appeal anyway. See Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553.(6th Cir. 2008).
The court seeing it differently, I respectfully dissent.