**Gerald L. ANCHOR and Hazel B. Anchor, Plaintiffs–Appellants,**

v.

**Dennis M. O'TOOLE and Melinda L. O'Toole, Defendants–Appellees.**

No. 95–3450.

United States Court of Appeals, Sixth Circuit.

Argued May 20, 1996.

Decided Sept. 9, 1996.

Rehearing Denied Oct. 9, 1996.

Robert R. Linton, Jr., Cleveland, OH (argued and briefed), for Plaintiffs–Appellants.

Martin J. Murphy (argued and briefed), Davis & Young, Cleveland, OH, Daniel D. Mason, Warhola, O'Toole, Loughman, Alderman & Stumphauzer, Lorain, OH, for Defendants–Appellees.

Before: RYAN and NORRIS, Circuit Judges; JOINER, District Judge.*

---

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

RYAN, Circuit Judge.

In this breach of contract claim involving the sale of real estate, plaintiffs appeal a favorable jury verdict awarding them only nominal damages. They claim the district court erred in denying their motion for a new trial based on the ground that damages were against the manifest weight of the evidence, and in granting judgment as a matter of law in favor of defendants on plaintiffs' breach of fiduciary duty claim. For the reasons that follow, we affirm on all grounds.

## I.

This breach of contract claim arose as a result of the sale of a home, referred to by the parties as an estate, located in Vermilion, Ohio. The estate is comprised of a large, custom-built tudor home, a guest house, a caretaker's house, and a barn, situated on 104 acres of river front property along the Vermilion River. Plaintiffs, Gerald and Hazel Anchor, put the estate up for sale in the summer of 1990. Gerald Anchor is a lawyer.

In June 1990, defendant Dennis O'Toole, who is also a lawyer, sent a letter of introduction to the Anchors expressing an interest in purchasing the estate. In this letter, O'Toole explained that he did not have the cash to purchase the property outright, but offered the Anchors, in partial payment of the purchase price, a one-third interest in O'Toole's company, International Marina Group (IMG). IMG was created for the exclusive purpose of entering into a joint venture in the development of a new marina located on Lake Erie. The letter provided the Anchors with extensive details about the nature of the joint venture, the potential for future profits, and Dennis and Melinda O'Tooles' interest in the venture. With the letter, O'Toole included several financial statements for the marina, which revealed that the enterprise had always operated at a loss.

Marina International was a joint venture entered into in December 1987 by IMG as 40% owner, and Spitzer Great Lakes Ltd. as 60% owner. O'Toole was the only shareholder and director of IMG. He was responsible for the day-to-day operations of the marina, for which services IMG received a management fee. The marina has over 600 imported floating docks; it is a deep water port located strategically half-way between Cleveland and the islands located in Lake Erie's western basin. In his letter to the Anchors, O'Toole represented that his interest in the marina was worth between $900,000 and $1.4 million, although he also warned plaintiffs that he had never had his interest appraised. The letter also speculated that the value of O'Toole's interest might rise dramatically if casino gambling were approved in Ohio.

The letter described the creation of the joint venture as follows:

> Development of the marina began with a plan of mine in 1978 and continued until everyone and their brother figured out what and why I was doing and tried to get into the act. In any event, the Port Authority awarded me the bid in October of 1987; my main competitor was Spitzer. We joined forces later that year and began development in the Spring of 1988. The award of the bid resulted in a 32 year lease [sic] of the east port area. . . .
>
> . . . Phase one and two were financed, in part, by the issuance of Ohio Port Development Bonds. . . . Balance of funds came from the individual companies and or the joint venture itself.

Anchor admitted at trial that he made no effort to inquire about, or investigate, the nature of IMG's interest, or to have the value of the business appraised.

A few days after receiving O'Toole's letter, Anchor met with O'Toole to tour the marina and to discuss further the possibility of selling the estate to the O'Tooles. The parties then entered into negotiations for the purchase of the estate. The final agreement states that the O'Tooles paid the Anchors $677,642 excluding the interest in IMG, for the estate. Surprisingly, however, nowhere does the purchase-sale agreement set forth the full purchase price for the estate. The agreement provided as follows:

2. *PURCHASE PRICE.*

Purchaser agrees to purchase said property as described above for the following consideration:

(a) the sum of $50,000.00 cash, payable upon closing;

(b) the sum of $50,000.00 cash upon the sale of Purchaser's residence and the close of escrow and disbursement of the sale proceeds to Purchaser; or by December 1, 1990, whichever first occurs;

(c) a promissory note in the amount of $410,000.00 secured by a mortgage deed on the Dean Road property [ (the estate) ], payable interest only at the rate of 9.5% per year in equal monthly installments, such monthly payments beginning on the first day of the month following close of escrow and the transfer of title from Seller to Purchaser, principal due and payable on June 30, 1995;

(d) the sum of $82,757.00 secured by a mortgage deed on the Dean Road property, payable in a lump sum including accrued interest at the rate of 9.5% per annum upon close of escrow of the sale of Purchaser's property located at 125 Alabama Avenue, but no later than 24 months after close of escrow of the Dean Road purchase, whichever first occurs. In no event shall the lump sum due on this mortgage be less than $100,000.00;

(e) the sum of $75,285.00 secured by a mortgage deed on the Dean Road property, payable in a lump sum including accrued interest at the rate of 9.5% interest per annum, all due and payable three years after close of escrow and transfer of title to Purchaser. In no event shall the lump sum be less than $100,000.00;

(f) *[a] non-assessable one-third interest of International Marina Group, Inc. in Marina International, Lorain, Ohio. The parties further stipulate and agree that a mortgage deed on the Dean Road property shall be recorded in this escrow in the amount of $70,849.00 to accrue interest at the rate of 9.5% per annum. At the time, but in no event later than six years after the close of escrow, Seller has received profit disbursements for its one-third interest in IMG from the operation of Marina International of the sum of $125,000.00, this mortgage obligation shall be satisfied. In the event IMG's profit distributions to Seller do not satisfy this requirement within six years after close of escrow, Purchaser shall immediately pay the difference between $125,000.00 and what has already been received by Seller theretofore in the form of profit disbursements for its one-third interest in IMG, Inc., and the aforesaid mortgage shall be then deemed satisfied and discharged of record.*

(Emphasis added.) The parties agreed that the "non-assessable" interest meant that the Anchors would incur none of the marina's liability nor any of its debts.

The parties signed the agreement on July 26, 1990, and the O'Tooles moved into the Anchors' estate on September 2, 1990; they still live there.

Shortly after the agreement was signed, the joint venture began experiencing shortfalls in business and consequently in revenues. Suddenly, IMG was unable to make its monthly debt service payments: 40% of $65,000 per month. Alan Spitzer, the 60% owner of the joint venture, became upset with O'Toole because O'Toole was in default of their partnership agreement as he was unable to make his "cash calls." Spitzer made the payments on O'Toole's behalf, but informed him that he (Spitzer) intended to dissolve the partnership agreement. O'Toole had no choice but to surrender his interest to Spitzer in order to avoid putting the bonds in default and/or filing for bankruptcy. In any case, Spitzer could have forced a dissolution upon O'Toole. O'Toole claims he informed Anchor that he was being forced to dissolve the partnership, but Anchor claims he had no notice of the dissolution.

Plaintiffs filed suit in December 1992, advancing a variety of claims, including breach of contract and breach of fiduciary duty, as a result of the O'Tooles' failure to transfer a one-third interest in IMG to the Anchors and because of the dissolution of the joint venture agreement. The case was tried to a jury, which returned a verdict in favor of the plaintiffs, but awarded them only nominal damages in the amount of $100. Before the jurors retired to deliberate, the magistrate judge granted the O'Tooles' motion for judgment as a matter of law on the breach of fiduciary duty claim. After the jury re-

turned its verdict, the Anchors moved "for a new trial on damages only ... [and] for a hearing on rescission." This motion was denied and plaintiffs filed a timely appeal.

## II.

We first address plaintiffs' claim that the magistrate judge "committed reversible error" in giving the jury, upon its request, a clarifying instruction on the issue of future profits. Plaintiffs claim that the jury awarded them only nominal damages because the court's clarifying instruction had the effect of "removing damages from the jury's consideration." We disagree and we will affirm the judgment for $100.

### A.

Three hours into their deliberations, the jurors sent the following note to the magistrate judge: "Is it possible to award the Anchors one third of the profits that the O'Tooles may receive (during the next 26 years) from the marina? Or do the damages have to be a dollar figure? Are court costs automatically paid by the losing side?" The magistrate judge informed the parties that there was absolutely no evidence on future profits and he planned to instruct the jury, consistently with the instructions already given, that any award of damages cannot be based on speculation, but must be based on evidence that established with reasonable certainty what that dollar value would be. The magistrate judge then asked the parties whether they had any objections to this explanation, to which the Anchors' attorney replied that he took "exception" to the charge. The magistrate judge then instructed the jury that they could not make an award of damages based upon a percentage of future profits because there was no evidence before them that would permit them to do so.

 Although a district court's actions in responding to questions from a jury and the supplemental instructions given to a jury generally are reviewed for an abuse of discretion, *United States v. August,* 984 F.2d 705, 712 (6th Cir.1992), *cert. denied,* 510 U.S. 854, 114 S.Ct. 158, 126 L.Ed.2d 119 (1993),

we review the magistrate judge's response in this instance for plain error only, because the plaintiffs failed to be "sufficiently specific to [have] enable[d] the trial court to follow" the objection if well taken. *Libbey–Owens–Ford Co. v. Insurance Co. of N. Am.,* 9 F.3d 422, 427 (6th Cir.1993). In compliance with Rule 51 of the Federal Rules of Civil Procedure, an issue will not be considered properly before an appellate court unless the party distinctly stated the issue objected to and the ground for that objection. *Id.* at 427. Additionally, "a party cannot state one ground for objection during trial and then state a different ground for objection on ... appeal." *Id.*

> This circuit requires that a formal objection be made before and after the jury instructions are given, unless "it is plainly apparent from the discussion between the parties and the judge that the judge was aware of a party's dissatisfaction with the instruction, as read to the jury, and the specific basis for that claimed error or omission."

*Id.* (quoting *Woodbridge v. Dahlberg,* 954 F.2d 1231, 1237 (6th Cir.1992)). Because plaintiffs simply took "exception" to the court's clarification to the jury without explaining the reasons for the "exception," we review this issue for plain error.

### B.

 In this diversity case, Ohio law determines the elements of damages plaintiffs must prove, and the quantum and type of evidence necessary to prove them. *See Blasky v. Wheatley Trucking, Inc.,* 482 F.2d 497 (6th Cir.1973). In Ohio, damages are an essential element of a plaintiff's claim for breach of contract. *Doner v. Snapp,* 98 Ohio App.3d 597, 649 N.E.2d 42, 44 (1994). To establish an entitlement to future profits, a plaintiff must satisfy a three-part test. The lost profits must be:

> "(1) ... within the contemplation of the parties at the time the contract was made,
>
> (2) ... the probable result of the breach of contract, and
>
> (3) ... not remote and speculative and may be shown with reasonable certainty."

*Arthur Young & Co. v. Kelly,* 88 Ohio App.3d 343, 623 N.E.2d 1303, 1308 (1993) (quoting

*Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883 (1984)).

Where a new business is involved, lost profits must be established " 'through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts.' " *Doner,* 649 N.E.2d at 47 (citation omitted). Here, plaintiffs failed to meet their burden as they presented no evidence that the marina would make a profit in the future, and indeed, both O'Toole and Spitzer testified that they could not predict whether the marina would ever be profitable.

Plaintiffs misunderstand the nature of the issue they are appealing. They take the magistrate judge to task for instructing the jury that plaintiffs failed to produce evidence of future profits. In their brief, plaintiffs argue that they presented O'Toole's and Spitzer's testimony as to the probable value of the marina and, accordingly, the jury should not have been instructed that the Anchors were not entitled to future profits. However, plaintiffs confuse "future profits" with the current value of IMG's interest in the marina. The Anchors cite numerous cases for the proposition that future profits need not be established with absolute certainty. Undoubtedly this is so, but *some* evidence of future profits *is* required to reach the jury, and plaintiffs here offered none. Whatever the value of the marina or IMG might have been at the time of the contract, it is irrelevant to the issue of whether the marina would ever make a profit in the future, and if so, how much. Because plaintiffs offered no evidence showing with reasonable certainty the amount of profit the marina is likely—not remotely or speculatively—to realize in the future, the magistrate judge's clarification to the jury on this issue was based on a correct statement of the law. Certainly, it was not plainly erroneous.

### III.

Plaintiffs next claim that the district court erred in denying their motion for a new trial, because the award of damages was against the manifest weight of the evidence. We review a denial of a motion for a new trial for an abuse of discretion, *Gafford v. General Elec. Co.,* 997 F.2d 150, 171 (6th Cir.1993), and, under diversity jurisdiction, we follow the federal standard rather than Ohio law, *see Arms v. State Farm Fire & Casualty Co.,* 731 F.2d 1245, 1248–49 (6th Cir.1984). Ordinarily we find no abuse of discretion unless we have " 'a definite and firm conviction that the trial court committed a clear error of judgment.' " *Gafford,* 997 F.2d at 171 (citation omitted). And, in reviewing a trial court's denial of a new trial motion on the ground that the verdict is against the clear weight of the evidence, we accept the jury's verdict if it was reasonably reached. *Portage II v. Bryant Petroleum Corp.,* 899 F.2d 1514, 1523 (6th Cir.1990).

Consequently, the scope of review of a damage award is extremely narrow. A trial court may not grant a new trial on the ground of insufficient damages unless the jury verdict is one that could not reasonably have been reached. *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 546 (6th Cir. 1981). The remedy of a new trial for inadequate damages is appropriate only where the evidence indicates that the jury awarded damages in an amount substantially less than *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence. Thus, if the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion.

In this case, there was competent, credible evidence that plaintiffs may have suffered no loss at all. Under Ohio law, a claimant may not recover damages based on the weakness of the case in opposition, but only on the basis of evidence that establishes more than mere assertions. *Sharp v. Clark,* No. 1285, 1992 WL 107849, at *3 (Ohio.Ct.App. May 20, 1992) (unpublished disposition). Here, the jury chose to accept defendants' version of the relationship between the parties and apparently determined that, although the O'Tooles breached the contract, the Anchors received the benefit of their bargain.

The amount of damages the Anchors claim to have suffered depends on a quantification or definition of the "interest" they should have received, but allegedly didn't, in the exchange. Paragraph 2(f) of the purchase-sale agreement states that the Anchors are to receive a one-third interest in IMG's interest in the marina. This "interest in an interest" is nowhere defined in the agreement, and the Anchors failed to clarify this issue for the jury with evidence other than their own assertions. The Anchors argue that their "interest" in IMG included one-third of the marina's "potential" for future profits, in addition to one-third of IMG's current value. In turn, plaintiffs argue that IMG's interest in the marina is what O'Toole represented it to be worth: between $900,000 and $1.4 million. They assert that the jury ought to have awarded them damages based on these figures.

The O'Tooles, on the other hand, argue that all the Anchors were entitled to under paragraph 2(f) at the time of signing the agreement was one-third of the profits, if any, and if there were no profits, then to $125,000 by August 1996. The O'Tooles assert that the total value of the purchase, including the $125,000 minimum guarantee from IMG, was $738,891. The O'Tooles also contend that *all* payments under the purchase-sale agreement have been made, and the remaining balance of $125,000 is due and payable in August 1996.

At trial, O'Toole testified that when the parties were negotiating the agreement, Anchor told O'Toole with respect to the interest in IMG:

> "... Who knows what the future holds. We will accept your one-third interest, but we want to put a value on it."
>
> "... Would you agree to a value of $125,000?"
>
> [O'Toole replied that he] had to talk to Malinda [sic] about that.
>
> And Malinda [sic]—that's what they wanted as their value of the 33 percent interest.
>
> [Question:] All right. And just so we are sure here, whether it is vested or non-assessable [sic], what interest are we talking about? Vested in what? Are you talking about the joint venture?
>
> [O'Toole:] Well, not really. Well, sure, for the vested interest, you would be talking about an ownership interest in IMG's ownership interest in that joint venture, but on the non-assessable [sic], what we were talking about really was what he wanted, was this income stream. There weren't any assets, Mr. Murphy, of, you know,—the joint venture didn't have assets per se.
>
> [Question:] Who owned all that down there?
>
> [O'Toole:] The Port Authority owned it all. They owned the buildings, the docks, all of that.... What the joint venture had was the right to use this.

Plaintiffs introduced no expert testimony or financial evidence concerning the "value" of IMG's "interest" in Marina International. To be sure, Anchor admitted at trial that he made no effort to inquire into the nature of IMG's interest, or to have its interest in the marina appraised.

From the language of the agreement, the nature of the transaction, and the evidence presented at trial, the jury could have concluded that the assignment of a one-third interest in IMG was simply collateral to secure the purchase of the home, for which interest the Anchors would receive a minimum of $125,000 in 1996. The evidence amply supported a conclusion that the Anchors' relationship to the O'Tooles was simply that of a creditor-debtor, and that as creditors the Anchors suffered no substantial damages, given the $710,000 they already received from the O'Tooles. The evidence likewise supported a conclusion that the only "interest" the Anchors had in the marina was the right to "potential" future profits during a period of six years.

The Anchors argue, unpersuasively we think, that somehow they are part owners of the marina, for which they only gave a fraction of the cost of their house, to which they contributed no assets, and from which they incurred no debts or liabilities. Reasonably, the jury could have completely rejected this argument and concluded, as the verdict re-

flects, that the Anchors lost nothing as a result of the dissolution, or alternatively, they were assigned a worthless interest in IMG.

We hold that the evidence reasonably supports the jury's verdict of $100 and therefore find that the magistrate judge did not abuse his discretion in denying plaintiffs' motion for a new trial on the ground of inadequate damages.

## IV.

The Anchors next appeal the magistrate judge's decision to grant defendants judgment as a matter of law on plaintiffs' breach of fiduciary duty claim. Upon defendants' motion, the magistrate judge found:

> Mr. Anchor very clearly in his testimony said, "I did not expect to become a shareholder in IMG because I knew all I was entitled to under the contract was a one-third interest in IMG's interest in Marina International, and I have no expectation of becoming a shareholder in IMG." He was very clear on that, and to make sure he was very clear, I asked him one last time.
>
> Consequently, I find as a matter of law that no fiduciary relationship existed between the Anchors and the O'Tooles that could have been breached, and I am going to withdraw that from the jury's consideration.

The Anchors argue that the magistrate judge erred in granting the O'Tooles' motion for judgment as a matter of law because plaintiffs presented sufficient evidence to create a jury question. Plaintiffs implicitly argue that they entered into some kind of investment/partnership/joint venture relationship with the O'Tooles as they cite cases referencing the fiduciary duties owed by a partner to another, or by a joint venturer to another, or by "controlling interest holder[s]" to "minority interest holders." They assert that they were "de facto investors in the venture" and thus the O'Tooles owed them a fiduciary duty, which the O'Tooles breached by dissolving IMG without their consent. Plaintiffs contend that because the question of the existence of a fiduciary relationship is a question of fact to be decided by the jury,

the magistrate judge committed reversible error in taking this issue away from the jury.

■■■■ We review a directed verdict *de novo* using the same test used by the trial court. *See Stone v. Greater Cleveland Regional Transit Auth.*, 92 Ohio App.3d 373, 635 N.E.2d 1281, 1284 (1993). A federal court exercising diversity jurisdiction applies the standard for judgment as a matter of law (directed verdict) used by the courts of the state whose substantive law governs the action. *Arms*, 731 F.2d at 1248. Ohio Rule of Civil Procedure 50(A)(4) provides:

> (4) *When Granted on the Evidence.* When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

■■■■ Rule 50(A)(4) directs the court to look at the sufficiency of the evidence on each element of a claim in order to determine whether to take the case away from the jury. *Stone*, 635 N.E.2d at 1283. "The general rule is that a directed verdict is appropriate only where the party opposing the motion fails to adduce any evidence on the essential elements of his claim or defense." *Id.* 635 N.E.2d at 1284. "Therefore, a motion for a directed verdict presents a question of law as opposed to a question of fact." *Id.*

■■■■ Under Ohio law, a fiduciary relationship is one in which " 'special confidence and trust, is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtues of this special trust.' " *Craggett v. Adell Ins. Agency*, 92 Ohio App.3d 443, 635 N.E.2d 1326, 1331 (1993) (citations omitted). In this context, the fiduciary's role can be assumed through a formal appointment, or it may arise *de facto* through a more informal confidential relationship. *Id.* A confidential relationship, in turn, is one where a "person comes to rely on and trust another in his

important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal." *Id.* (internal quotation marks and citations omitted). "Such a confidential relationship, however, *cannot be unilateral.*" *Id.* (emphasis added). Both Anchor and O'Toole were lawyers who presumably understood the nature of the transaction they were conducting; there was no evidence offered that Anchor reposed any·special trust in O'Toole or acted in reliance thereupon, or that O'Toole recognized any such reliance, such that a confidential relationship was created between them.

"The Ohio Supreme Court has explained that a fiduciary duty may arise from an informal relationship only if *both* parties understand that a special trust or confidence has been reposed." *Id.* (emphasis added). This, the Anchors did not establish, and thus their ordinary business relationship cannot be turned into a fiduciary one absent factors of mutual knowledge of confidentiality or the undue exercise of power or influence. *See id.* 635 N.E.2d at 1332.

The Anchors assert that a fiduciary relationship existed because they were either "silent" partners, "investors" in the joint venture, or "minority interest holders" in the closed corporation, IMG. However, these are legal conclusions that must be supported by the evidence.

■ Under Ohio law, the elements a plaintiff must establish to prove the existence of a partnership are:

1. an express or implied partnership contract between the parties;
2. the sharing of profits and losses;
3. mutuality [of] agency;
4. mutuality [of] control; and
5. the co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds.

*Cooke v. Pointer Oil Co. of Florida*, No. CA 5599, 1981 WL 6439, at *9 (Ohio.Ct.App. Oct. 14, 1981) (unpublished disposition). All these elements must be proved to establish a partnership relationship. *See id.*

■ Similarly, a joint venture is a partnership for the purposes of a single business enterprise. To establish the existence of a joint venture, there must be:

1. a joint contract;
2. an intention to associate as joint venturers;
3. community of interest and control, including contributions to the joint venture;
4. the mutual right to direct and control the purpose of the joint venture; and
5. an agreement for the division of profits *and* losses.

*See L & H Leasing Co. v. Dutton*, 82 Ohio App.3d 528, 612 N.E.2d 787, 790 (1992). For a joint venture to exist "there *must* be a sharing of the profits *and* the losses jointly, not severally." *Id.* (emphasis added). As with proving the existence of a partnership relationship, all the elements of a joint venture must also be established with credible evidence to sustain a motion for directed verdict or for summary judgment. *See Mill Creek Builders, Inc. v. James Waltz Custom Builders*, No. L–90–316, 1991 WL 270419, at *3 (Ohio.Ct.App. Dec. 20, 1991) (unpublished disposition).

The plaintiffs have presented absolutely no evidence that the Anchors' relationship with the O'Tooles was a partnership or a joint venture. On the contrary, the evidence established an ordinary debtor-creditor relationship.

Viewing the evidence in the light most favorable to the Anchors, we hold that defendants are entitled to judgment as a matter of law on the breach of fiduciary duty claim as plaintiffs failed to introduce evidence to satisfy every element of their claim.

**V.**

Finally, plaintiffs appeal the magistrate judge's denial of their request for rescission and restitution, arguing that the evidence established that defendants substantially breached the purchase-sale agreement, the result of which was to unjustly enrich the O'Tooles at the Anchors' expense. Plaintiffs assert that by wrongfully transferring the Anchors' interest in the marina to Spitzer, the O'Tooles deprived plaintiffs of their "expectation interest"—*i.e.*, their right to partic-

ipate in future marina profits—and plaintiffs are therefore entitled to a return of their estate.

■ The grant or denial of equitable relief is reviewed for an abuse of discretion. *See Schwartz v. Gregori,* 45 F.3d 1017, 1023 (6th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995). We hold that the magistrate judge did not abuse his discretion in denying plaintiffs the remedy of rescission. Ohio law makes clear that absent fraud, rescission of a real estate conveyance is not available when such an equitable remedy is not specifically provided for in the contract.

■ "[T]he Ohio Supreme Court held that the equitable relief of cancellation and rescission of a deed conveying real estate will not be granted for a mere breach of contract." *Gem Sav. Ass'n v. Edwards,* No. 10411, 1987 WL 18199, at *3 (Ohio.Ct.App. Oct. 6, 1987) (unpublished disposition) (citing *City of Cleveland v. Herron,* 102 Ohio St. 218, 131 N.E. 489 (1921)). "Failure of the grantee to perform a promise which formed the whole or part of the consideration for the execution of a conveyance gives rise to no right of rescission in the grantor, where such failure was not expressly made a ground of forfeiture." *Id.*

■ Here, the O'Tooles, at most, failed to pay a portion of the consideration for the conveyance of the estate; even so, Ohio law will not "relieve a party from the effects of an injudicious contract. The mere fact that the purchase price has not been paid is not sufficient ground to set aside a deed. The fraud must be in the original transaction and not in the unfulfillment of the contract." *Id.* at *4. What is more:

> It seems quite well settled that mere failure of consideration, whether partial or total, when unmingled with fraud or bad faith, is not sufficient in equity to warrant the rescission of an executed contract; and, further, that in the absence of fraud a deed for real estate will not be set aside as for a failure of consideration on the sole ground that the promises and agreements which entered into its execution, and which were to be performed in the future, have

not been performed. So equity will not interfere ordinarily *where a grantor has seen fit to accept a promise on the part of his grantee for the performance of certain acts, without specifically providing that failure to perform shall be a condition of forfeiture, or in some way affect the validity of the deed, or entitle him to a reconveyance.*

*Id.* (emphasis added) (citing 1 POMEROY's EQUITABLE REMEDIES, § 686).

The contract between the Anchors and the O'Tooles provides for no such equitable remedy. Additionally, whatever interest the Anchors had in IMG, it was a minimal part of the purchase-sale agreement. As the O'Tooles point out, defendants have already paid the Anchors over $710,000 for the estate; whatever the estate's actual value, which neither party discusses, it seems that the "failure of consideration," if failure it was, was *not* a substantial breach of contract. Accordingly, the Anchors suffered no actual damages. They bargained for nothing more than the hope that the marina would make a profit, and therefore are not entitled to a rescission of the real estate contract.

## VI.

For these reasons, we **AFFIRM** the judgment of $100 entered by the magistrate judge.