NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0393n.06

No. 22-5820

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

THOMPSON RESEARCH GROUP, LLC,

    Plaintiff-Appellee,

v.

WINNEBAGO INDUSTRIES, INC.,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 24, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

Before: CLAY, GRIFFIN, and DAVIS, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Thompson Research Group, LLC gave defendant Winnebago Industries, Inc. a tip that a competitor was open to acquisition and claims that, in return, Winnebago agreed to pay a customary "finder's fee." Winnebago acquired the competitor but refused to pay a finder's fee, claiming the parties did not enter into a contract, and alternatively, that Thompson Research was not responsible for the acquisition. At the conclusion of a nine-day trial, a jury rendered a verdict that Winnebago breached its contract with Thompson Research and awarded $5 million in damages. Winnebago appeals the jury's verdict as well as the district court's award of prejudgment interest. We affirm the jury's verdict, but vacate and remand for further proceedings the award of prejudgment interest.

I.

Kathryn Thompson and Chris White cofounded Thompson Research, a market-research firm that focuses on the recreational vehicle (RV) industry. In 2015, Thompson learned that Grand

Design, a major player in the towable-RV market, was open to acquisition. In an attempt to broker and then profit from a merger, Thompson Research passed that information along to another RV manufacturer, Winnebago Industries.

In December of 2015, Thompson called Sarah Nielsen, Winnebago's CFO, about a potential "transformative" transaction but did not tell Nielsen she meant acquiring Grand Design. That call eventually led to Nielsen connecting several times with White in early 2016. During those conversations, White asked if Winnebago would pay Thompson Research a finder's fee if the acquisition was successful. According to White, "[w]ithout hesitation, [Nielsen] said, 'We have no problem paying you. We just have to understand the mechanics of how we do that.'" White understood Nielsen's "mechanics" comment to be about the logistics of a payment mechanism—he told her he would look into the issue—and believed the two had agreed to the finder's fee. In a follow-up call, White confirmed with Nielsen that Winnebago would pay Thompson Research a finder's fee if the acquisition was successful; Nielsen did not ask about the specific fee amount, nor did she suggest she was unclear about the terms of the deal or ask for a written contract. Similarly, Nielsen did not say that Thompson Research needed to play a specific role in the acquisition in order to be paid. In contrast, Nielsen denied that she agreed to pay Thompson Research a finder's fee and that she was aware of any industry standard with respect to finder fees.

Confident that an agreement to receive a finder's fee was in place, on January 14, 2016, Thompson told Nielsen the acquisition target was Grand Design. Nielsen was "shocked" by this news. At a meeting two weeks later, Thompson reiterated the same information about Grand Design to Winnebago's CEO, Mike Happe. No finder's fee was discussed at the meeting because Thompson thought the companies "already had an agreement."

Happe testified that he called Grand Design in February of 2016 and learned it was not open to an acquisition. On that call, Happe stated that the estimated worth of Grand Design was discussed, but Grand Design "was very clear . . . that they were not at the time considering an acquisition of their company." But Nielsen's notes about that call suggested otherwise—she documented a post-call meeting with Happe noting that Winnebago "would have to be very prepared to have a conversation with [Grand Design]."

Nielsen's notes notwithstanding, Happe testified he learned about Grand Design being open to acquisition from an investment banker shortly after Thompson Research's Grand Design tip, in March of 2016, which he successfully pursued. On October 3, 2016, Winnebago announced its acquisition of Grand Design for $520 million. Winnebago and its witnesses credited the banker, not Thompson Research, with the tip that led to the Grand Design acquisition.

News of the acquisition surprised Thompson Research, as it was unaware that acquisition talks were underway. That afternoon, Thompson asked Happe if Winnebago would pay a finder's fee to Thompson Research; Happe said Winnebago would not pay Thompson Research because the banker, not Thompson Research, was "the cause of the acquisition." So Thompson Research sued Winnebago, alleging it was entitled to a finder's fee for the Grand Design acquisition under contract and unjust-enrichment theories.

At trial, Thompson Research's witnesses admitted that it never entered into negotiations regarding the amount of the finder's fee or signed a written contract with Winnebago for a finder's fee. Thompson and White explained that they were "advised" by their advisory group that it was too early to put the deal in writing, and that normally a written contract would come "close" to the acquisition.

Instead, Thompson Research relied on Nielsen's oral promises, which it backed up with testimony by James Carmack, an expert witness in "the industry standard for finder's fees associated with an acquisition, the type at issue in this case, and the prevalence of oral agreements in that regard." He explained that, generally, "a finder just has to bring the parties together . . . to provide the impetus to get the deal started, but . . . does not have to be involved in the nuts and bolts of the transaction" to be entitled to a finder's fee. In Carmack's experience, "the industry standard" for Thompson Research's involvement in the Grand Design acquisition was "a finder's fee" of "1 to 2 percent of the ultimate acquisition price"; and such a fee would ordinally require only an oral contract. He also testified that the specific industry in which the acquisition occurred was irrelevant for finder's fee purposes—the fee was always between one and two percent—but admitted that his expertise is in the securities industry and did not know whether the RV industry adopted the "finder's fee" industry standard. Even so, he testified that he would expect a CFO (i.e., Nielsen) of a publicly traded company (i.e., Winnebago) to know finder's fees were customary, and normally one to two percent of the acquisition price. Winnebago did not call an expert witness to counter Carmack's testimony.

Based on this and other evidence presented at trial, the jury found that Winnebago breached its "contract (oral or implied)" with Thompson Research and awarded $5 million in damages. After trial, Winnebago moved for judgment as a matter of law and for a new trial and Thompson Research moved for prejudgment interest. The district court denied Winnebago's motions and awarded Thompson Research the statutory maximum ten percent prejudgment interest starting on October 3, 2016. This timely appeal followed.

II.

A.

Winnebago first argues that it was entitled to judgment as a matter of law on Thompson Research's contract claims because Nielsen never agreed to pay a specific price for the Grand Design tip, preventing any meeting of the minds.

"We review the denial of [judgment as a matter of law] de novo. A federal court exercising diversity jurisdiction applies the standard for [judgment as a matter of law] used by the courts of the state whose substantive law governs the action." *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) (citations omitted). Here, that is Tennessee. "Under Tennessee law we must 'take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence.'" *Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 526 (6th Cir. 2011) (quoting *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977)). "A verdict should be directed only where a reasonable mind could draw but one conclusion." *Id.* (internal quotation marks omitted). "On appeal, we need show no deference to the trial court's assessment of the sufficiency of the evidence before a jury." *Tschira v. Willingham*, 135 F.3d 1077, 1087 (6th Cir. 1998) (internal quotation marks omitted).

In Tennessee, "[a] contract must result from a meeting of the minds of the parties in mutual assent to the terms." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (internal quotation marks omitted). "In determining mutuality of assent, courts must apply an objective standard based upon the parties' manifestations." *Id.* "Indefiniteness regarding an essential element of a contract may prevent the creation of an enforceable contract.

A contract must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (internal quotation marks and citations omitted). These standards apply whether the contract is written or oral. *See, e.g.*, *In re Est. of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). "Certainty with respect to promises does not have to be apparent from the promise itself, so long as the promise contains a reference to some document, transaction or other extrinsic facts from which its meaning may be made clear." *Doe*, 46 S.W.3d at 196 (quoting 1 Richard A. Lord, *Williston on Contracts*, § 4:27 (4th ed. 1990)). Particularly relevant here:

> If the parties provide a practicable method for determining [the] price or compensation there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract. The same is true if they agree upon payment of a "reasonable" price or compensation. There are cases, however, in which it is clear that the parties have not expressly or implicitly agreed upon a "reasonable price," and also have not prescribed a practicable method of determination. Where this is true, the agreement is too indefinite and uncertain for enforcement.

*Id*. at 196–97 (quoting 1 Joseph M. Perillo, *Corbin on Contracts*, § 4.3 (Rev. ed. 1993) (alteration in original)).

Winnebago argues that it did not contract with Thompson Research because no price was discussed. But Thompson Research presented unrebutted expert witness testimony that Nielsen should have been aware of finder's fees and that they were customarily one to two percent of the acquisition price. Thompson Research also provided evidence that Nielsen knew that Thompson Research expected to be compensated for the Grand Design tip, stated that Thompson Research would be paid if the acquisition was successful, and never asked how much it was expected to pay. Although Nielsen denies agreeing to a finder's fee or being aware of any industry standard with respect to finder fees, "[u]nder Tennessee law we must take the strongest legitimate view of the evidence in favor of the opponent of the motion," *see Hometown Folks, LLC*, 643 F.3d at 526

(internal quotation marks omitted), in this case, Thompson Research. It is true that the contract did not reference other documents to supply the price term, but that does not render it fatally indefinite. Thompson Research relies on the "extrinsic fact" that a widely held industry standard exists where a finder's fee is owed to the finder of the acquisition for the amount of one to two percent of an acquisition, supporting this assertion with expert testimony. *See Doe*, 46 S.W.3d at 196–97. Based on this industry standard, a jury could reasonably find that the contract contains "sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *Id.* at 196. These facts differ from Winnebago's main case, *Doe*, where the alleged contract stated that the plaintiff would pay unspecified "charges" to the defendant hospital, thus making the terms of the contract "indefinite." *Id*. at 197. In *Doe*, the defendant offered "[n]o express reference to a 'document, transaction or other extrinsic facts' nor [did] it set out 'a practicable method' by which [the plaintiff's] 'charges' are to be determined." *Id.* Thompson Research has offered evidence to demonstrate that the finder's fee in this case has an understood meaning within the industry that put Winnebago on notice that it would owe a fee of one to two percent to Thompson Research. Thus, we find that a reasonable mind could find that Thompson Research's use of extrinsic facts was sufficient to prove the terms of the contract were definite.

Nor does Winnebago's argument that it, at most, "agreed to negotiate over a price," meet the heightened standard for a directed verdict. True, "[w]hen a term is left open for future negotiation, there is nothing more than an unenforceable agreement to agree." *Cadence Bank, N.A. v. Alpha Tr.*, 473 S.W.3d 756, 774 (Tenn. Ct. App. 2015). But that principle must be considered alongside the general rule that parties need only "provide a practicable method for determining the price or compensation." *Doe*, 46 S.W.3d at 196 (citation and brackets omitted). Drawing all reasonable inferences in Thompson Research's favor, Nielsen agreed for Winnebago

to pay Thompson Research a reasonable fee for the Grand Design tip, and the customary finder's fee provides a practicable method for determining the price owed. Because Thompson Research provided evidence that Nielsen was aware of the industry standard for a finder's fee and that fee is a narrow compensation range, her agreement with White was not an "agreement to agree"; rather, it was an agreement to compensate Thompson Research at least one percent of the acquisition price. Thus, a reasonable mind could conclude that White and Nielsen agreed on a reasonably certain price, which is sufficient under Tennessee law to form a binding contract.

Next, Winnebago contends that the industry standard one-to-two percent range cannot be used as the price term for its contract with Thompson Research because White never discussed a specific compensation range with Nielsen (who claimed to be unaware of finder's fees) and because Carmack, White, and Thompson, all testified that they were unaware of a finder's fee previously being paid in the RV industry. Thomspon Research rebuts this testimony with Carmack's statement that Nielsen should have known about finder's fees and their customary compensation range. Although Thompson Research does not provide the Court with indisputable evidence, we do not conclude that "a reasonable mind could draw but one conclusion." *See Hometown Falls*, 643 F.3d at 526. After taking all reasonable inferences in Thompson Research's favor, a reasonable mind could conclude that Nielsen agreed to pay a customary finder's fee of one-to-two percent to Thompson Research for the Grand Design tip.

The record also supports Thompson Research's implied-in-fact contract claim for the same reasons. "An express oral contract and a contract implied in fact are very similar with the primary difference between them being the manner in which the parties manifest their assent." *Thompson v. Hensley*, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003). Express contracts demonstrate assent through "words, writings, or some other mode of expression," while implied-in-fact contracts do

so through "the conduct of the parties and the surrounding circumstances." *Id.* (citation omitted). Even if Nielsen's conversations with White could not establish a contract through words, her course of conduct did. She repeatedly met with White and Thompson while aware that Thompson Research expected compensation. From the moment Winnebago learned of the potential tip, it acted as Thompson Research would have expected if Winnebago intended to pay Thompson Research. When viewing the evidence in Thompson Research's favor, it entered into an implied-in-fact contract with Winnebago.[1]

B.

Winnebago next argues that the jury instructions were deficient in two respects. Such a claim succeeds only if the district court abused its discretion. *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1074 (6th Cir. 2015). Our "inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *Pivnick v. White, Getgey & Meyer Co., LPA*, 552 F.3d 479, 488 (6th Cir. 2009) (citation omitted). We will "not reverse a decision on the basis of an erroneous jury instruction where the error is harmless"; instead, reversal is required only where the instructions were "confusing, misleading, and prejudicial." *Id.* (citations omitted).

---

[1]Winnebago also argues that it is entitled to judgment as a matter of law on Thompson Research's equitable claims of unjust enrichment and breach of an implied-in-law contract. We need not address these claims because we affirm the jury's verdict that Winnebago had a contract with Thompson Research, which—as explained in the jury instructions—conflicts with an implied-in-law contract. *See Jones v. LeMoyne-Owen Coll.*, 308 S.W.3d 894, 906 (Tenn. Ct. App. 2009) (listing "no existing, enforceable contract between the parties covering the same subject matter" as the first element of an implied-in-law contract claim).

1.

In Winnebago's view, the following breach-of-contract instructions were so vague as to be confusing or misleading:

> As the party seeking to enforce an oral contract, Thompson Research Group must demonstrate that:
>
> One, the parties mutually assented to the terms of the contract; and
>
> Two, that the terms were sufficiently definite to be enforceable.
>
> The mutual assent need not be manifested in writing and, instead, may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions. The mutual assent should not, however, be inferred from the unilateral acts of one party or by an ambiguous course of dealing between the parties from which different inferences regarding the terms of the contract may be drawn.

Winnebago faults these instructions for not stating that parties must agree to *material* contract terms, not specifically stressing that the *compensation* term must be "sufficiently definite," and failing to note that "[a] party cannot establish mutual assent based on uncommunicated intentions or states of mind." It argues that more specific instructions were necessary because, without them, the jury could not know which terms Winnebago and Thompson Research needed to agree on.

Those concerns are unfounded. The jury was instructed on the correct terms of a valid contract under Tennessee law and instructed that the parties had to agree on all the contract's terms. *See, e.g.*, *Staubach Retail Servs.-S.E., LLC*, 160 S.W.3d at 524; *Doe*, 46 S.W.3d at 196; *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007). If anything, this instruction weighed in Winnebago's favor because, taken literally, it required agreement on more than just material terms for a valid contract. Accordingly, the district court did not abuse its discretion by declining to use Winnebago's proposed additional instructions.

2.

Winnebago further claims that the jury should have been required to find that the industry-standard finder's fee was proved by "clear and satisfactory" evidence instead of merely a preponderance of the evidence, citing Sixth Circuit authority. However, Tennessee law guides this analysis because "the burden of proof is a substantive aspect of a claim," *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) (internal quotation marks omitted), and we use Tennessee substantive law in a diversity-jurisdiction case such as this, *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

In Tennessee, "the existence of a contract must be proven by a preponderance of the evidence." *Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000); *see also, e.g.*, *Reeves v. Etowah City Sch. Bd. of Educ.*, 806 S.W.2d 176, 179 (Tenn. 1991). When the Tennessee Supreme Court has discussed custom and usage, it has endorsed the preponderance-of-the-evidence standard. *See Ellett v. Embury & Maury*, 217 S.W. 818, 821 (Tenn. 1919) ("Indeed, the great preponderance of the evidence shows that the transaction involved was not an extraordinary one, but was a usual and ordinary transaction."); *See also, e.g.*, *Nashville, C. & St. L. Ry. v. Mayo*, 14 Tenn. App. 28, 35–36 (Tenn. Ct. App. 1931) ("[T]he burden of proof is upon [plaintiff] to show [custom and usage] to the jury by a preponderance of the evidence.").

We are unaware of any Tennessee case applying the clear-and-satisfactory standard to prove industry custom and usage and Winnebago supplies no Tennessee case law for this Court to review. To be sure, Tennessee courts have used the "clear and satisfactory" standard at times, but have done so in situations different from those here. *See White v. Bettis*, 56 Tenn. 645, 651 (1872) (fraud to set aside a contract); *Lexon Ins. Co. v. Windhaven Shores, Inc.*, 601 S.W.3d 332, 339 (Tenn. Ct. App. 2019) (challenge to the veracity of "a document accompanied by a certificate of

No. 22-5820, *Thompson Rsch. Grp., LLC v. Winnebago Indus. Inc.*

acknowledgment"); *Mercy v. Miller*, 166 S.W.2d 628, 632 (Tenn. Ct. App. 1942) (adverse possession claim must show the owner's knowledge of claimant's adverse holding). But having been presented no instance in which Tennessee courts have applied that higher standard to contract-formation concerns, we cannot conclude that the district court abused its discretion by instructing the jury to use the normal preponderance-of-the-evidence standard.

C.

Winnebago's final issue with the jury verdict is one concerning the verdict form—it contends the form conflated legal and equitable contract claims, and thus the district court should have granted its motion for a new trial on this ground.[2]

The denial of a motion for a new trial is reviewed for an abuse of discretion. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996). In a diversity case, we apply the federal review standard, so there is no abuse of discretion unless we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Id*. (citation omitted). Accordingly, we must "accept the jury's verdict if it was reasonably reached." *Id*. "[I]f the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion." *Id*. We review the verdict form's substance based on state law. *Id*.

In Tennessee, "courts have wide discretion in tailoring the questions on a verdict form to meet the needs of each unique case." *In re Est. of Link*, 542 S.W.3d 438, 463 (Tenn. Ct. App. 2017). "Courts should provide separate jury instructions for each theory of liability that clearly

---

[2]Thompson Research argues that Winnebago waived this issue, but we disagree. Winnebago's proposed verdict form separated the legal breach-of-contract claim from the equitable breach-of-implied-contract claim, and Winnebago argued for the use of its verdict form. In doing so, Winnebago objected to the verdict form that was used, so it did not waive this claim. *See United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021); *Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566 (6th Cir. 2001).

explain the elements of each claim, thus enabling the jury to consider whether the plaintiff has met its burden of proof with respect to each." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 910 (Tenn. 1999). "[T]he most effective approach in dealing with multiple claims for relief is to require the jury to respond either to a general verdict form accompanied by special interrogatories or to a special verdict form that has been prepared to parallel the instructions to the jury on each claim." *Id*. "A new trial is . . . warranted when verdict forms are composed in such a faulty fashion that they do not address each of the plaintiffs' theories of recovery and do not allow the jury to adequately respond to each claim." *Id*. at 911. That said, "[w]ell-settled law requires courts to construe the terms of a verdict in a manner that upholds the jury's findings, if it is able to do so." *Id*. So "[e]ven if a verdict is defective in form, it is to be enforced if it sufficiently defines an issue in such a way as to enable the court to intelligently articulate a judgment." *Id*.

The verdict form asked the jury to decide these questions:

1. Do you find that there was a contract (oral or implied) between Plaintiff-Thompson Research Group, LLC and Defendant Winnebago Industries, Inc.?

2. Do you find that Defendant Winnebago Industries, Inc. breached its contract (oral or implied) with Plaintiff Thompson Research Group, LLC?

3. Do you find that Defendant Winnebago Industries, Inc. was unjustly enriched by Plaintiff Thompson Research Group, LLC?

4. What amount of damages, if any, do you find Plaintiff Thompson Research Group, LLC is entitled to receive as a result of the conduct of Defendant Winnebago Industries, Inc.?

Winnebago argues that it is entitled to a new trial because the verdict form did not make clear whether the jury found that it breached an oral or an implied contract.

The verdict form did not separate all Thompson Research's various contract claims—the form sets forth different theories of liability but does not make it clear which theory of liability (oral or implied-in-law contract) ultimately prevailed. But that is a problem in form, not substance.

Whether the contract was oral or implied in fact is immaterial: as discussed earlier, the evidence presented at trial supports a verdict in Thompson Research's favor under both theories, and the form shows that the jury found Winnebago liable for breaching a contract with Thompson Research. Given this, any defect in the verdict form does not require a new trial because we can still "intelligently articulate a judgment" that Winnebago breached its contract with Thompson Research. *See id.*

D.

Finally, Winnebago argues that the district court erred by awarding ten percent prejudgment interest to Thompson Research starting on October 3, 2016.

Once again, Tennessee law guides our analysis. *Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 481 F.3d 337, 354 (6th Cir. 2007). The decision to award "prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). "Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found." *Id.* Yet "[d]iscretion should not be arbitrarily exercised" and "[t]he applicable facts and law must be given due consideration." *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). "An appellate court should not reverse for 'abuse of discretion' a discretionary judgment of a trial court unless it affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining." *Id.*

Principles of equity guide the award of prejudgment interest. *Myint*, 970 S.W.2d at 927. "In reaching an equitable decision, a court must keep in mind that the purpose of awarding the

interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Id*. "Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000). Courts should also consider whether "the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds." *Myint*, 970 S.W.2d at 927. To determine whether the amount of damages is certain, we ask "whether the amount of damages is ascertainable by computation or by any recognized standard of valuation." *Id*. at 928. Finally, "interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds." *Id*. at 927.

Winnebago argues that the district court inadequately explained its decision, set the interest rate too high, and began the accrual date too early. We agree with Thompson that the district court did not abuse its discretion in determining the accrual date; however, the district court inadequately explained its decision, and thereby failed to provide this Court with the information necessary to assess whether the interest rate determination was an abuse of discretion.

In failing to adequately explain its reasoning for its calculation of the interest rate awarded to Thompson Research, the district court's ruling on the issue consists of the following:

> Here, the Court finds the equities weigh in favor of an award of prejudgment interest. While Winnebago argues an award of prejudgment interest would constitute a windfall to TRG . . . the Court disagrees and finds prejudgment interest will more fully compensate TRG for the loss of use of the funds to which it was legally entitled . . . .

> The Court further finds that the award of prejudgment interest at a rate of 10% per annum is fair, given the particular circumstances of the case, to fully compensate TRG for the loss of the use of funds to which it was legally entitled. Under the facts of this case, the Court does not find that this amount of prejudgment interest constitutes a windfall.

Winnebago argued before the district court that the average rate of return during the relevant time period was 1.6% for a five-year treasury note, and a ten percent rate is inappropriate "given the historically low interest rate environment at the time." Although Winnebago disputes the amount of the prejudgment interest on "reasonable grounds," the district court does not address these arguments with any specificity. *See Myint*, 970 S.W.2d at 927. The district court merely references "the equities" and "the particular circumstances of the case" as justifying the prejudgment interest, without more, this Court is unable to meaningfully review the district court's judgment. *See Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 687 (6th Cir. 2013) (remanding the district court's prejudgment award determination based on its inadequate reasoning, instructing the district court on remand to "consider the case-specific factors such as, but not limited to: the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation."); *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992) (remanding the district court's prejudgment award determination because "the district court, without explanation, declined to impose prejudgment interest").

The district court should have expressly considered Winnebago's arguments and provided reasoning as to why a ten percent interest rate is an appropriate award in this case. The reasoning as it stands is insufficient. Because the district court provided an inadequate explanation as to the amount of the prejudgment award, we vacate the district court's prejudgment award and remand to the district court with instructions "to support an award or denial of prejudgment interest with findings of fact incorporating its reasons for its decision." *Drennan*, 977 F.2d at 253.

Regarding the accrual date for the interest, the district court made a reasonable decision by having interest accrue on the date Winnebago breached its contract with Thompson Research. Choosing any other date—and we note Winnebago did not offer a concrete alternative date below—would have been arbitrary on the record before us. Nor are we persuaded that Thompson Research's delay in filing its complaint or how long it took this case to be tried to a verdict matters. As to the former, the complaint was well within the applicable six-year statute of limitations, *see* Tenn. Code Ann. § 28-3-109; *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31 n.1 (Tenn. 2007), and therefore timely under Tennessee law; and regarding the latter, Winnebago has abandoned this claim by not offering any legal support, *see Vander Boegh v. Energy Solutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014). And regardless, Thompson Research was not responsible for litigation delays either, so the delay does not weigh against awarding prejudgment interest, *see Christmas Lumber Co., Inc. v. Valiga*, 99 S.W.3d 585, 596 (Tenn. App. 2002).

## III.

For the reasons stated, we affirm in part and vacate and remand in part. We affirm the jury's verdict, but vacate and remand for further proceedings the district court's award of prejudgment interest.